[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-15647
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-21513-CV-PAS

FACULTY SENATE OF FLORIDA INTERNATIONAL
UNIVERSITY,
LISANDRO PEREZ, CARMEN DIANA DEERE,
HOUMAN A. SADRI, JOSE ALVAREZ,
NOEL SMITH, JUAN MARTINEZ,
BRETT JESTROW, VANESSA HARPER,

Plaintiffs-Appellees-
Cross-Appellants,

versus

JOHN WINN, et al.,

Defendants,

STATE OF FLORIDA,

Intervenor-Defendant-
Appellant-Cross-
Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 31, 2010)

Before EDMONDSON, BLACK and SILER,[*] Circuit Judges.

PER CURIAM:

Florida, by statute, restricts the use of state money for travel by state employees to countries that the federal government has listed as "State Sponsors of Terrorism." See Fla. Stat. §§ 112.061(3)(e), 1011.90(6). Some professors and researchers at different state universities in Florida contend, on a variety of grounds, that the Act cannot be enforced.[1] In this appeal, they say that the Florida Act obstructs and conflicts with federal law and that the Act intrudes upon the federal government's power to control foreign affairs for our country.

The United States, although invited early on to take part in the case, is not a party to the case or otherwise involved in the litigation. No foreign country is involved in this litigation either. Nothing in the record suggests that the United States or any other government has complained about the Act to Florida or that some foreign government has complained to the federal government about the Act. But we understand that these facts are not controlling.

The Act prohibits the use, in connection with travel to state sponsors of

---

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1]Faculty Senate, an organization that represents the interests of the Florida International University ("FIU") faculty, is also a Plaintiff.

terror, of funds made available by the State to state universities.  Fla. Stat. §

1011.90(6).[2]  The limitation on funds applies to both state money and other funds

(typically funds contributed by third-party grantors such as private foundations)

that are administered by the State (at state expense).[3]  The Act also prohibits state

involvement in reimbursement to state employees and officers for the same kinds

of travel-related activities.[4]  Fla. Stat. § 112.061(3)(e).[5]  The Act controls the

State's own spending and, in this case, state spending on education --  two core

---

[2]The pertinent section of the statute reads this way:

> None of the state or nonstate funds made available to state universities may be used to implement, organize, direct, coordinate, or administer, or to support the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state. For purposes of this section, "terrorist state" is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism.

Fla. Stat. § 1011.90(6).

[3]For this appeal, we agree with Defendants that the distinction between state-contributed funds and other funds administered by the State is one without a meaningful difference.  The key point is this one: the use of both kinds of funds results in an expense to the State.

[4]We consider the Act only as applied to university employees.  See United States v. Frandsen, 212 F.3d 1231, 1235 (11th Cir. 2000) ("The general rule in this circuit is that for a facial challenge to be successful, a plaintiff must establish that no set of circumstances exists under which the law would be valid." (quotation marks and alterations omitted)).

[5]The pertinent section of the statute reads this way:

> Travel expenses of public officers or employees for the purpose of implementing, organizing, directing, coordinating, or administering, or supporting the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state shall not be allowed under any circumstances. For purposes of this section, "terrorist state" is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism.

Fla. Stat. § 112.061(3)(e).

3

issues of traditional and legitimate state concern.

The district court granted Plaintiffs summary judgment in part and denied it in part.[6]  In granting the partial summary judgment, the district court concluded that the Act's limitation on non-state funds (that is, funds that came into state accounts from outside grantors but are administered by the State) was both preempted by federal law and violated the federal government's foreign affairs power; but the district court denied summary judgment with respect to state funds. Our review of the district court's disposition of this case on summary judgment is de novo.  Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010).  We cannot agree entirely with the district court.

We presume that the State can validly legislate on spending and on education matters.  But we accept that, if a conflict with federal law or policy were plain enough, even these traditional state concerns could be overridden.  We, however, do not see the Act as clashing sharply with federal law or policy.  We conclude that the Act's brush with federal law and the foreign affairs of the United States is too indirect, minor, incidental, and peripheral to trigger the Supremacy Clause's -- undoubted -- overriding power.

No federal statute or regulation expressly requires States to pay for foreign

---

[6]Both sides appealed from the part that was unfavorable to them.

travel for state university employees. No federal law says States cannot differentiate among foreign nations when it comes to spending for academic travel. And Plaintiffs do not contend that the Act has been expressly preempted by a federal statute. But, of course, the federal government does have a lot of laws dealing with how foreign countries -- including those that sponsor terrorism -- are to be treated. These federal laws touch on many subjects, mostly trade and financial matters.[7] In some instances, travel is restricted (even if one can afford to pay to go, the law does not allow it or allows it only in certain conditions). Most of the laws enable the Executive Branch to tighten or loosen sanctions in a discretionary way. Plaintiffs contend that Florida's Act impedes these laws.[8]

---

[7]E.g., 18 U.S.C. § 2332d (restrictions on financial transactions); 22 U.S.C. § 2371 (restrictions on foreign aid); 22 U.S.C. § 2780 (arms embargo); 50 U.S.C. app. § 2405(j) (partial trade embargo). See generally 50 U.S.C. app. § 5(b) (grant of authority to the President to impose sanctions during wartime); 50 U.S.C. § 1701 (grant of authority to the President to impose sanctions during a national emergency).

[8]Plaintiffs also contend that the Act conflicts with the federal licensing scheme regulating travel with Cuba. The district court stressed this perceived conflict, concluding that the Act makes it impossible for Plaintiffs to travel to Cuba because some assistance (employment verification and so on) by their universities is required to obtain a license.

Federal law permits persons holding certain licenses to travel to Cuba for academic purposes. 31 C.F.R. § 515.560(a). The regulations do not appear to require universities to participate directly in the license application or verification process. The travel-related guidelines issued by the Office of Foreign Assets Control indicate that the federal government takes a flexible approach in the kind of proof it allows for verification. See OFFICE OF FOREIGN ASSETS CONTROL, COMPREHENSIVE GUIDELINES FOR LICENSE APPLICATIONS TO ENGAGE IN TRAVEL-RELATED TRANSACTIONS INVOLVING CUBA 21 (2004), *available at* http://www.ustreas.gov/offices/enforcement/ofac/programs/cuba/cuba_tr_app.pdf ("Each person engaging in travel-related transactions under a general license must be able to document how he or she qualifies under the general license. For example, a resume or curriculum vitae generally demonstrates an individual's full-time professional area. A written work plan done prior to

The Supreme Court has made some decisions that can guide our thinking about preemption and foreign affairs. Plaintiffs advance the Crosby v. National Foreign Trade Council, 120 S. Ct. 2288 (2000), decision as controlling and commanding that Florida spend money for its university employees to travel. We accept Crosby is important, but we think it is too different from the present circumstances to help Plaintiffs.

Crosby is a case in which a state statute conflicted with definite and identifiable federal laws on the same subject. Id. at 2290-92. Massachusetts enacted a law restricting its doing business with companies that did business with Burma: Burma, by name, was selected and singled out by Massachusetts. Id. at 2291. If a company traded with Burma, Massachusetts would not -- in most circumstances -- do business with the company. Id. The obvious idea was to reduce trade across-the-board with Burma. Later, the United States enacted

travel might also support an individual's intention of engaging in a full-time schedule of research.").

In any event, that the Act would prohibit university resources from being used to supply employment-verification-related proof to the federal government is not clear to us; and Florida does not contend that the Act does so. When, if ever, the federal government would require the proof that Plaintiffs contend the Act would bar is also not clear to us from the travel regulations. Even if the Travel Act did bar state university involvement in providing such verification, we question that this circumstance would result in the preemption of Florida's law. Cf. Printz v. United States, 117 S. Ct. 2365, 2384 (1997). But we conclude that such a claim is not ripe for our review; a final conclusion on that issue can await a post-enforcement, as-applied challenge on a less speculative record than exists here. Texas v. United States, 118 S. Ct. 1257, 1259 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotation marks omitted)).

legislation imposing sanctions on Burma and allowing the President to control

trade to Burma as a means of influencing Burma's policies. Id. at 2291-92. The

Supreme Court concluded that the state statute conflicted with the federal Act in

both the scope and type of economic sanctions imposed and undermined the

President's discretionary authority to control the imposition of economic sanctions

on Burma. Id. at 2294. Therefore, the state act was preempted.

We think this case is different. Florida has not unilaterally selected by name

a foreign country on which it has declared, in effect, some kind of economic war.

Florida's Act does not prohibit -- as a matter of law -- anyone from traveling any

place. And especially unlike Crosby, it does not penalize anyone for traveling any

place. Nor does it penalize anyone for aiding or otherwise paying for someone

else's travel.[9] It does not prohibit travel -- as a matter of state law -- where federal

law allows travel. It does not attempt to prohibit, or even to obstruct, trading

broadly by anyone with anyone. Florida's law is narrow. Nothing in the record

shows that its practical impact, in reality, can be economically great on other

---

[9]We do not think it legally significant even if most or all third-party grantors now seem to require university management of grant funds. Although grantors may need to modify their grant disbursement and management procedures to work around the Act, the grantors are free to do so; the State is exerting no coercive pressure -- economic or otherwise -- on the grantors to discourage them from doing so.

countries.[10]  It only prohibits spending Florida's money to facilitate travel to countries determined by the federal government (not especially selected by Florida) to sponsor terrorism.

A State traditionally has had great control over its spending, especially for education: a local responsibility. Cf. Epperson v. Arkansas, 89 S. Ct. 266, 270 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities.")  The States are always faced with choices about how best to spend limited resources for education.  What educational programs give the most value for the money?  Should this program be cut back to let this one grow?  Concerns about student and faculty safety are legitimate considerations for spending.  And avoiding potential in-state scandals about entanglement with foreign espionage (Florida had recently dealt with such an issue arising from academic travel) can be legitimately considered too by a State as it decides how to spend its money to finance the travel of its employees.[11]

---

[10]We are not sure that the size of the Act's economic impact on the pertinent foreign countries matters in this kind of case.  But the district court focused on the Act's economic impact to Cuba, noting that from 2001-2006, the Cuban Research Institute at Florida International University spent $125,511 on direct travel expenses to and from Cuba.  We conclude this travel expenditure, as well as the other financial figures appearing in the record, are not big enough to be of serious concern on the world stage.  By the way, no other State has been shown to have a law like Florida's or to be considering one; but even if several other States did enact a similar law, if Florida's spending (as set out in this record) is a guide, tremendous sums seemingly would not be involved.

[11]When the Bill that became the Act was read in Florida's House of Representatives, the Act's sponsor indicated that this embarrassment with state entanglement in a federal espionage

We accept -- in the absence of clear guidance from Congress or the Supreme Court -- that a State's decision to use its money to fund academic work in country "A" but not country "B" is not an impermissible sanction against "B" and is not beyond a State's valid powers. The spending and education decision neither conflicts with the federal sanctions laws nor more than incidentally invades the realm of federal control of foreign affairs.  At least, this record will not support such a conclusion.

Plaintiffs draw our attention to some other Supreme Court decisions that involve preemption and foreign affairs more broadly than a conflict of a state statute with a federal law or system of laws.  We acknowledge the possibility of preemption based on federal foreign affairs powers.  We know it has happened. We have studied Zschernig v. Miller, 88 S. Ct. 664 (1968).

But unlike the Oregon statute and practice in Zschernig, Florida is not asking

_____

case was a concern behind the law:

> Recently, the U.S. Justice indicted one professor and one academic counselor at a
> Florida university on charges of espionage against the United States.  These
> espionage activities were conducted utilizing university resources to organize
> trips to a terrorist nation.  This Bill will prohibit taxpayer dollars from being used
> by community colleges and universities to organize trips to terrorist countries.

Later, in response to a question, the sponsor made this observation:

> Any travel to a terrorist country necessarily subsidizes that terrorist regime . . . .

We do not regard these comments or other similar comments as outcome-determinative.

9

in its Act -- even in the Act's application -- for proof about the conduct of any foreign government or making a judgment about that conduct which is apart from the federal government's own announced judgment. See id. at 667. Florida accepts altogether the list published by the Executive Branch of the United States. Florida in this Act does not entangle itself with foreign laws or foreign officials. The potential for embarrassment to the federal government, see id., that could come from all that is lacking here.

And we have also paid attention to American Insurance Ass'n v. Garamendi, 123 S. Ct. 2374 (2003). In that case, the Supreme Court concluded that a California insurance statute interfered with the federal government's conduct of foreign relations and was therefore preempted. Id. at 2379. That case involved a clear federal foreign policy position on Holocaust-era claims evidenced by, among other things, international agreements by our country's Executive Branch, official correspondence by a high-level member of the Executive Branch, and the historical role of the Executive Branch in dealing with wartime claims resolution. Id. at 2384-85. But we do not have that kind of powerful evidence of a clear and express foreign policy here.

On this record, nothing shows to us that a definite substantive foreign policy position exists in favor of academic travel -- much less in favor of travel to

countries that sponsor terrorism -- that could be undermined by Florida's Act. No clear conflict between federal policy and state law à la Garamendi is presented here. But, even if some indistinct desire on the part of the Executive Branch or Congress to encourage generally academic travel has been shown,[12] the strength of Florida's traditional state interest in managing its own spending and the scope of its academic programs is sufficient to overcome the conflict given the lack of the conflict's clarity and severity. See id. at 2389 ("[I]t would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted.").

The Florida Act's limitation on state spending is not preempted by federal law or violative of the federal foreign affairs power. We affirm the district court's decision with regard to state funds, but we reverse the judgment with regard to non-state funds administered at state expense. We vacate the district court's permanent injunction barring enforcement of the pertinent state statute. We

---

[12]Plaintiffs point us to several sources as evidence of such a policy: First, even when the federal government imposes its harshest sanctions, such as a general travel ban, it usually continues to allow academic travel. Second, in an interview with the Washington Post, President Bush indicated that as a next step to opening a dialogue with Iran, he would like to see more cultural and university exchanges. David Ignatius, *Bush's Message to Iran*, WASH. POST, Sept. 15, 2006, at A19. Third, Congress enacted Title VI of the Higher Education Act of 1965, which, among other things, discusses the importance of "American experts in and citizens knowledgeable about world regions, foreign languages, and international affairs, as well as upon a strong research base in these areas." See 20 U.S.C. § 1121(a).

remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, INJUNCTION VACATED,

AND REMANDED.