[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13958
_____

D.C. Docket No. 1:12-cv-22072-KMM

ODEBRECHT CONSTRUCTION, INC.,
a Florida corporation,

                                                    Plaintiff - Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT
OF TRANSPORTATION,

                                                    Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 6, 2013)

Before MARCUS, HILL and SILER,[*] Circuit Judges:

MARCUS, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by
designation.

In this interlocutory appeal, the Secretary of the Florida Department of Transportation appeals the district court's order granting Odebrecht Construction, Inc. a preliminary injunction barring the Department's enforcement of a Florida law known as the "Cuba Amendment," 2012 Fla. Laws 196, § 2 (amending Fla. Stat. § 287.135).   Broadly speaking, the law prevents any company that does business in Cuba -- or that is in any way related to a company that does business in Cuba -- from bidding on state or local public contracts in the State of Florida.  See Fla. Stat. § 287.135(2) ("A company that . . . is engaged in business operations in Cuba . . . is ineligible for, and may not bid on, submit a proposal for, or enter into or renew a contract with an agency or local governmental entity for goods or services of $1 million or more."); id. § 215.473(1)(c) (defining the term "company" to encompass all subsidiaries, parent companies, or affiliates of the entity).

In a thorough opinion, the district court concluded that Odebrecht had met its burden of persuasion on all four elements of the preliminary injunction inquiry, and issued a preliminary injunction prohibiting the Florida Department of Transportation from implementing or enforcing the Cuba Amendment.  After careful review, we conclude that Odebrecht has demonstrated a substantial likelihood of success on its claim that the Cuba Amendment violates the Supremacy Clause of the Constitution under principles of conflict preemption.

2

The Cuba Amendment conflicts directly with the extensive and highly calibrated federal regime of sanctions against Cuba promulgated by the legislative and executive branches over almost fifty years.  The Supremacy Clause of the Constitution "provides a clear rule that federal law 'shall be the supreme Law of the Land.'"  Arizona v. United States, 132 S. Ct. 2492, 2500 (2012) (quoting U.S. Const. art. VI, cl. 2).  The Cuba Amendment differs dramatically from the federal regime as to the entities covered, the actions triggering sanctions, and the penalties imposed.  The Amendment also overrides the nuances of the federal law and weakens the President's ability "to speak for the Nation with one voice in dealing" with Cuba.  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000).  In addition, Odebrecht has demonstrated the other equitable requirements that warrant a preliminary injunction: Odebrecht would have suffered irreparable harm absent the injunction, the balance of harms strongly favored the injunction, and the injunction did not disserve the public interest.  We affirm.

## I.

Odebrecht Construction, Inc. ("Odebrecht" or "OCI") is a Florida construction corporation founded in 1990, with its principal place of business in Coral Gables, Florida.  Since its inception, Odebrecht has been awarded 35 public contracts in Florida worth almost $4 billion.  In 2011, 100% of OCI's revenue, approximately $215 million, was derived from public infrastructure and

transportation projects.  Odebrecht continues to bid successfully on high-value public contracts in Florida.  Thus, for instance, in May 2012, Broward County awarded an Odebrecht joint venture a $226 million infrastructure contract at the Fort Lauderdale-Hollywood International Airport.

As for the Florida Department of Transportation  ("FDOT") in particular, Odebrecht has completed multiple contracts for the agency in the past with a combined value of around $170 million.  Indeed, in June 2012, FDOT certified Odebrecht as qualified to bid on a number of potential FDOT contracts, with a maximum capacity of $1.8 billion.  And Odebrecht has signaled its intent to bid on five different FDOT contracts through the first quarter of 2013.  In short, Odebrecht is not merely a speculative participant in Florida's public contracting market; it is a frequent and active one.

Odebrecht does not do business in Cuba, and has never done so. Odebrecht's Brazilian parent company, Odebrecht S.A., has a different chain of foreign subsidiaries unrelated to Odebrecht, however, and some of those foreign companies do business in Cuba.  More specifically, Odebrecht S.A. has a Brazilian subsidiary, Companhia de desenvolvimento e Participacoes, S.A., which has another Brazilian subsidiary, Companhia de Obras e Infra-Estrutura, which has a British Virgin Islands subsidiary, COI Overseas Ltd.  Both Companhia de Obras e

4

Infra-Estrutura and COI Overseas Ltd. are involved in the Brazilian-financed expansion of the Port of Mariel in Cuba.

The Cuba Amendment has an effective date of July 1, 2012. On June 4, 2012, before the statute went into effect, Odebrecht filed a complaint in the U.S. District Court for the Southern District of Florida, seeking declaratory and injunctive relief barring the Secretary of the Florida Department of Transportation from enforcing the Cuba Amendment.  The following day, Odebrecht filed its operative amended complaint and a motion for a preliminary injunction. Odebrecht claimed that the Cuba Amendment violates the Supremacy Clause, U.S. Const. art. VI, cl. 2; the Foreign Affairs Power, see, e.g., Zschernig v. Miller, 389 U.S. 429 (1968); and the Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3. After full briefing and after conducting a thorough hearing, the district court granted the injunction.  The court reviewed at length both the Cuba Amendment and the federal laws relating to Cuba, and then addressed Odebrecht's constitutional claims, concluding that Odebrecht had demonstrated a substantial likelihood of success on each of them.  The court also found that Odebrecht had satisfied the other equitable requirements for a preliminary injunction.

## II.

We review a district court's grant of a preliminary injunction for abuse of discretion.  SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir.

1999).  "[B]ut we review <u>de novo</u> the legal conclusions on which [preliminary injunctions] are based."  <u>ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.</u>, 557 F.3d 1177, 1198 (11th Cir. 2009).  We review any factual findings by the district court for clear error.  <u>Unique Fin. Concepts</u>, 196 F.3d at 1198.

Under the familiar four-part test, a preliminary injunction is warranted if the movant demonstrates "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is issued, and (4) an injunction would not disserve the public interest."  <u>Grizzle v. Kemp</u>, 634 F.3d 1314, 1320 (11th Cir. 2011) (quoting <u>N. Am. Med. Corp. v. Axiom Worldwide, Inc.</u>, 522 F.3d 1211, 1217 (11th Cir. 2008)).  Here, as in so many cases, the first question is critical.  We begin -- and end -- our answer to that question with Odebrecht's claim that the Cuba Amendment is preempted by the long-standing and extensive federal regime limiting American companies from doing business in Cuba.

## A.

The Supremacy Clause of the United States Constitution provides that the Constitution and the laws of the United States "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  "Under this principle, Congress has the power to

6

preempt state law." Arizona v. United States, 132 S. Ct. 2492, 2500 (2012) (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000)).  Preemption can occur in a number of circumstances.  Its most straightforward form, express preemption occurs when Congress "enact[s] a statute containing an express preemption provision." Id. at 2500-01.  That has not occurred in this case, nor is there any claim that it has.  The second -- field preemption -- precludes the states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  Id. at 2501 (citing Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 115 (1992)). The Supreme Court has instructed us that we may infer congressional intent to displace state law altogether "from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Id. (internal quotation marks and alterations omitted).

Third, and most critical for our purposes, "state laws are preempted when they conflict with federal law." Id. (citing Crosby, 530 U.S. at 372).  Conflict preemption covers "cases where 'compliance with both federal and state regulations is a physical impossibility.'"  Id. (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963)).  But conflict preemption is

7

broader than that; it also covers cases "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  In this broader form, the lines between conflict preemption and field preemption are admittedly blurry, as the Supreme Court has recognized.  See Crosby, 530 U.S. at 372 n.6 ("[T]he categories of preemption are not rigidly distinct.  Because a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, field pre-emption may be understood as a species of conflict pre-emption." (citations and internal quotation marks omitted)).  The essential question in this case is whether the Cuba Amendment stands as an obstacle to the carefully calibrated federal regime.  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  Crosby, 530 U.S. at 373.  Because the conflict preemption analysis requires a searching inquiry into the provisions of both the federal and state laws at issue, we begin by examining, in some detail, the many federal statutes and regulations pertaining to Cuba.

**1.**

"Since the early 1960s, U.S. policy toward Cuba has consisted largely of isolating the island nation through comprehensive economic sanctions, including

an embargo on trade and financial transactions."  M.P. Sullivan, Cong. Research Serv. R41617, Cuba: Issues for the 112th Congress 30 (July 20, 2012) ("Cuba Issues").  The authority for, and contours of this federal policy come from a complex and interlocking network of statutes, regulations, and executive orders. Because our focus for present purposes is on the conflicts between the federal regime and the Cuba Amendment, which targets private companies, we highlight the provisions of the federal law that also affect private companies.

The authority for the federal Cuba embargo dates back to 1917, when Congress empowered the President to regulate and embargo trade with foreign nations.  See Trading with the Enemy Act, ch. 106, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. app. §§ 1-6, 7-39, 41-44).  The statute affords the President broad powers to regulate, license, and prohibit trade with foreign nations:

> [T]he President may, through any agency that he may designate, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise --
>
> (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and
>
> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

9

by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. app. § 5(b)(1).

With respect to Cuba, the President has repeatedly exercised this power through the comprehensive Cuban Assets Control Regulations ("CACR"). The CACR were first promulgated by the Treasury Department in July 1963, almost fifty years ago.[1] The CACR are currently administered and enforced by the Treasury Department's Office of Foreign Assets Control. See 31 C.F.R. pt. 515.

The provisions of the CACR that most directly affect private companies relate to imports, exports, and other transactions involving Cuba or Cuban nationals. Broadly speaking, the regulations prohibit, unless specifically authorized, any dealing in any property in which Cuba or a Cuban national has an

---

[1] Since the enactment of the International Emergency Economic Powers Act of 1977, the President is only authorized to exercise the embargo powers conferred by Congress in that statute if the President first declares a national emergency, and may only exercise the powers conferred by the Trading with the Enemy Act during times of war. See 50 U.S.C. § 1701; id. app. § 5(b)(1) (empowering the President "[d]uring the time of war"). However, existing embargoes, such as the one against Cuba, were grandfathered in by Congress. As the Supreme Court has explained, "rather than requiring the President to declare a new national emergency in order to continue existing economic embargoes, such as that against Cuba, Congress decided to grandfather existing exercises of the President's 'national emergency' authorities." Regan v. Wald, 468 U.S. 222, 228 (1984). "This grandfather provision also provided that '[t]he President may extend the exercise of such authorities for one-year periods upon a determination for each such extension that the exercise of such authorities with respect to such country for another year is in the national interest of the United States.'" Id. at 229 (quoting 50 U.S.C. app. § 5 note). The CACR promulgated in the 1960's are still valid by virtue of these extensions as well as by Congress' subsequent codification in 1996 of the economic embargo against Cuba, see 22 U.S.C. § 6032(h), though the regulations have been "alternately loosened and tightened in response to specific circumstances," Wald, 468 U.S. at 243.

interest of any nature.  See 31 C.F.R. § 515.201(a), (b).  "Property" is expansively defined to include not only tangible property, but also contracts, securities, and services as well.  31 C.F.R. § 515.311(a).  These provisions also apply to exports to Cuba, whether from the U.S. or even through offshore dealing by a person or entity subject to the CACR, because by definition a product exported to Cuba is one in which Cuba or a Cuban national has an interest.  In keeping with the regulations' expansive definition of property, the ban on exports covers not only tangible goods, but also "the exportation of securities, currency, checks, drafts and promissory notes."  31 C.F.R. § 515.405.

The CACR also specifically prohibit importation or other dealings in merchandise that is of Cuban origin or is made from products of Cuban origin or has been located in or transported from or through Cuba.  31 C.F.R. §§ 515.204, 515.410; see also 22 U.S.C. § 6040(a) ("The Congress notes that section 515.204 of title 31, Code of Federal Regulations, prohibits the entry of, and dealings outside the United States in, merchandise that . . . is of Cuban origin; . . . is or has been located in or transported from or through Cuba; or . . . is made or derived in whole or in part of any article which is the growth, produce, or manufacture of Cuba.").  Related to the ban on imports are restrictions placed on vessels that have engaged in trade with Cuba.  Subject to waiver for certain vessels engaging in licensed or exempt trade, "[n]o vessel carrying goods or passengers to or from

Cuba or carrying goods in which Cuba or a Cuban national has an interest may enter a U.S. port with such goods or passengers on board."    31 C.F.R. § 515.207(b).  Moreover, no vessel that enters Cuba for trade may enter a U.S. port for a period of 180 days from the date the vessel departed from Cuba.  31 C.F.R. § 515.207(a).

Notably, the CACR only place restrictions on any "[p]erson . . . subject to the jurisdiction of the United States," 50 U.S.C. app. § 5(b)(1), which is defined by regulation to include U.S. corporations, their domestic and foreign subsidiaries, and any foreign company owned or controlled by a U.S. citizen.  31 C.F.R. § 515.329.  There is nothing in this record to suggest that Odebrecht has run afoul of the CACR, because neither it nor any of its subsidiaries does any business with Cuba.  Significantly, the CACR do not sanction a U.S. company like Odebrecht for the business activities of its foreign parent company or of a distant foreign affiliate that shares a common parent company.

Congress has remained active in legislating with respect to Cuba, and the current CACR reflect the additional sanctions and exceptions Congress has crafted over many years.  Thus, the Cuban Democracy Act of 1992, codified at 22 U.S.C. §§ 6001-6010, ramped up economic sanctions against the Cuban government while simultaneously permitting humanitarian relief to the Cuban people.  See generally 22 U.S.C. §§ 6001-6002 (congressional findings and statements of policy).

12

Additional comprehensive legislation came four years later, when Cuban MiG's shot down two U.S. civilian private planes in February 1996. See 22 U.S.C. § 6046 (Congressional findings condemning attack). Shortly thereafter, Congress enacted the Cuban Liberty and Democratic Solidarity Act of 1996 ("Libertad Act" or "Helms-Burton Act"), 22 U.S.C. §§ 6021-6091. One of the provisions of the Act codifies the regulatory sanctions that were in place on March 1, 1996. See 22 U.S.C. § 6032(h) ("The economic embargo of Cuba, as in effect on March 1, 1996, including all restrictions under part 515 of title 31, Code of Federal Regulations, shall be in effect on March 12, 1996, and shall remain in effect, subject to section 6064 of this title."). As a panel of this Court has previously explained, this provision of the Helms-Burton Act "continues the embargo indefinitely and effectively suspends the . . . requirement that the President revisit the embargo each year." See United States v. Plummer, 221 F.3d 1298, 1308 n.6 (11th Cir. 2000). Congress subsequently relaxed some of the Helms-Burton Act's sanctions in the Trade Sanctions Reform and Export Enhancement Act of 2000, codified at 22 U.S.C. §§ 7201-7209, which loosened the restrictions on exporting agricultural and medical products to Cuba.

In short, the economic embargo against Cuba is pervasive. But the federal regime also contains numerous exceptions, permitting certain kinds of transactions with Cuba through licensing as well as through complete exemptions. One of the

13

major exemptions is for published and informational materials, whether commercial or otherwise, 31 C.F.R. § 515.206(a), which includes "[p]ublications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, news wire feeds, and other information and informational articles," 31 C.F.R. § 515.332. In addition, the Helms-Burton Act authorizes the President to establish and implement an exchange of news bureaus between the U.S. and Cuba if certain conditions are met. 22 U.S.C. § 6044.

Another substantial category of exceptions is for agricultural and medical products. The Cuban Democracy Act provides that "[e]xports of medicines or medical supplies, instruments, or equipment to Cuba shall not be restricted" except under certain circumstances, such as where there is a reasonable probability that the product will be used in human rights abuses, will be reexported, or could be used in the production "of any biotechnological product." 22 U.S.C. § 6004(c). In addition, the Trade Sanctions Reform and Export Enhancement Act of 2000 prevents the President from imposing any unilateral agricultural sanction or medical sanction against a foreign country or foreign entity unless Congress approves it, again subject to certain exceptions. 22 U.S.C. §§ 7202, 7203. The statute also terminated any existing unilateral agricultural or medical sanction in effect as of October 28, 2000. Id. The statute does provide, however, that any export of agricultural commodities, medicine or medical devices to Cuba must be

14

done pursuant to 1-year licenses issued by the United States Government. Id. § 7205(a). Moreover, the exemption applies only to exports to Cuba, and does not affect the ban on importation of goods from Cuba. Id. § 7208. The statute also directs the Secretary of the Treasury to promulgate regulations providing for general licenses to travel to, from, or within Cuba for the marketing and sale of agricultural and medical goods. Id. § 7209(a); accord 31 C.F.R. §§ 515.533(e), 515.560 (provisions of CACR authorizing travel and travel-related transactions incident to sales of agricultural commodities, medicine, or medical devices).

A final and important exception from the Cuba sanctions is for telecommunications services. The Cuban Democracy Act permits telecommunications services between the United States and Cuba, and authorizes telecommunications facilities as may be necessary "to provide efficient and adequate telecommunications services between the United States and Cuba." 22 U.S.C. § 6004(e)(1), (2). It does not authorize, however, any investment by a United States person in a domestic telecommunications network within Cuba. Id. § 6004(e)(5). The CACR further authorize U.S. telecommunications providers to engage in all transactions incident to the provision of telecommunications services or satellite radio or television services between the United States and Cuba. 31 C.F.R. § 515.542. The regulations also authorize persons or entities covered by the regulations to enter into and pay for contracts with non-Cuban

15

telecommunications providers to provide telecommunications services to individuals within Cuba, so long as the Cuban individuals receiving the services are not members of the Cuban government.  31 C.F.R. § 515.542(c).  As with the agricultural and medical exceptions, the CACR also authorize travel and travel-related expenses in connection with the marketing, sale, and provision of telecommunications services.  31 C.F.R. § 515.533(f).

We do not labor on these points to comment on the wisdom or efficacy of the federal Cuban sanctions regime or its exceptions, but rather simply to show that the executive branch has considerable authority and discretion in the field of Cuban sanctions, and has actively exercised that authority, just as Congress has actively legislated.  Federal policy towards Cuba is long-standing, it is nuanced, it is highly calibrated, and it is constantly being fine-tuned.  It is designed to sanction strongly the Castro regime while simultaneously permitting humanitarian relief and economic transactions that will benefit the Cuban people.  When the State of Florida promulgated the Cuba Amendment, it plainly was not operating in an area where the federal government has been asleep at the switch.

**2.**

It is against this substantial backdrop of federal law that Governor Rick Scott, on May 1, 2012, signed into law the Committee Substitute for Committee Substitute for House Bill 959, which is codified at Chapter 2012-196, § 2, Laws of

16

Florida. More commonly known as the "Cuba Amendment," this law provides in relevant part that a company "engaged in business operations in Cuba or Syria, is ineligible for, and may not bid on, submit a proposal for, or enter into or renew a contract with an agency or local governmental entity for goods or services of $1 million or more." Fla. Stat. § 287.135(2).[2] In other words, the law cuts off access to Florida's substantial public contracting market, which is worth some $8 billion a year at the state level alone, not including local government contracts. The Cuba Amendment's effective date was July 1, 2012, although the district court's preliminary injunction was entered before that date and has prevented the law from being enforced.

Each crucial term in the state statute is defined broadly. "Business operations" means "engaging in commerce in any form in Cuba . . ., including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commerce." Id. § 287.135(1)(b). And most notably for our purposes, a "company" is defined as any "entity or business association, including all wholly owned subsidiaries, majority-owned subsidiaries, parent companies, or affiliates of such entities or business associations, that exists for the purpose of making profit."

---

[2] The Cuba Amendment's application to companies doing business in Syria has not been challenged in this case, and is not before us on appeal.

17

Fla. Stat. § 215.473(c) (emphases added).  In other words, as the district court aptly summarized, "the Cuba Amendment effectively encompasses domestic companies with no connection to Cuba other than by proxy."  Although neither Odebrecht nor any subsidiary of Odebrecht does business in Cuba, the Cuba Amendment applies to Odebrecht, because Odebrecht has distant foreign affiliates -- COI Overseas Ltd. and Companhia de Obras e Infra-Estrutura -- that share a common parent company with Odebrecht and that are involved in a project to expand the Port of Mariel in Cuba.

The broad reach of the Cuba Amendment and its applicability to Odebrecht are not in dispute.  The Florida State Board of Administration's own preliminary list estimates that the Cuba Amendment applies to 238 companies that the State invests in, including "major airlines, banks, pharmaceuticals and oil companies."

Nor is it seriously in dispute that the purpose of the Cuba Amendment is to use the lever of access to Florida's $8 billion-a-year public contracting market to exert additional economic pressure on the Cuban government and to influence American foreign policy.  Governor Scott acknowledged as much when he signed the Cuba Amendment into law, stating in a letter to Florida Secretary of State Ken Detzner that the Cuba Amendment "demonstrates Florida's commitment to spreading political and economic freedom in Cuba" and that "[i]t is imperative that

18

Florida and the United States continue to place economic pressure" on the Cuban government.

The Cuba Amendment is enforced through the public bidding process. "At the time a company submits a bid or proposal for a contract or before the company enters into or renews a contract with an agency or governmental entity for goods or services of $1 million or more, the company must certify . . . that it does not have business operations in Cuba . . . ." Fla. Stat. § 287.135(5). If a company files a false certification, it is subject to a "civil penalty equal to the greater of $2 million or twice the amount of the contract" and it becomes "ineligible to bid on any contract with an agency or local governmental entity for 3 years." Id. § 287.135(5)(a)(1)-(2). The civil penalty is enforced by the agency or local governmental entity that is a party to the contract; there is no private right of enforcement by unsuccessful bidders or by "any other person other than the agency or local governmental entity." Id. § 287.135(6).

Finally, we note that foreign governments have complained to the United States about the Cuba Amendment, both prior to and following its enactment. Most notably, Canada and Brazil, Florida's two largest foreign trading partners, both have protested the Cuba Amendment. For instance, the office of the Canadian ambassador to the United States placed a phone call to the Florida Chamber of Commerce, expressing concern that the law would affect a slew of Canadian

companies that work in both Florida and Cuba.   The Brazilian Minister of Development, Industry, and Trade lodged a similar note with the United States Commerce Secretary, John Bryson, conveying Brazil's "deep concern" with the adverse effects of the Cuba Amendment, in particular its effects on the "growing bilateral trade" between the United States and Brazil.

Several parties to the World Trade Organization ("WTO"), including the European Union, Canada, Norway, Switzerland, and Singapore, also expressed concern that the Cuba Amendment conflicts with the United States' commitments under the Agreement on Government Procurement.   WTO, Committee on Government Procurement, Minutes of the Formal Meeting of 18 July 2012 ¶¶ 25-37.   The WTO Meeting took place after the district court entered its preliminary injunction, but the EU "sought general information from the United States on the Florida law, including relevant references and information on the on-going court proceedings regarding the validity of the law, in particular in regard to the potential expiry of the injunction" and reiterated that it "wished to be informed and updated about any changes regarding the situation, on a regular basis."   Id. ¶¶ 27, 34.   Other parties expressed similar sentiments.   E.g. id. ¶¶ 29-30 (statements of Canada and Norway).

**B.**

20

The briefest summary of both the federal and state laws now before us reveals the obvious, direct and apparent conflict between them. Our analysis is guided in no small measure by the unanimous judgment of the Supreme Court in Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000). At issue in Crosby was the constitutionality of a Massachusetts law that, like the State of Florida, prohibited state agencies from purchasing goods or services from any person or entity doing business with Burma, with a few exceptions for companies that are in Burma solely to report the news or to provide international telecommunications goods or services or medical supplies. 530 U.S. at 367.[3] Three months after the Massachusetts law was passed, Congress passed a statute imposing a set of mandatory and conditional sanctions on Burma. Id. at 368. The federal statute banned "all aid to the Burmese Government except for humanitarian assistance, counternarcotics efforts, and promotion of human rights and democracy." Id. It also required U.S. representatives to international financial institutions to vote against loans or other assistance to or for Burma, and it cut off entry visas to Burmese government officials unless required by treaty or to staff the Burmese mission to the United Nations. Id. The statute delegated to the President

---

[3] The Cuba Amendment does not contain these limited exceptions. Indeed, the United States Telecom Association has filed an amicus brief in support of Odebrecht, which points out that the federal sanctions regimes for state sponsors of terrorism -- Iran, Syria, Sudan, and Cuba -- all include exemptions for the provision of international telecommunications services and that the Cuba Amendment therefore punishes what the federal law expressly permits. See Br. for United States Telecom Association as Amicus Curiae at 18-25.

21

the authority to end the sanctions once he "determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government." Id. The statute also empowered the President to impose further sanctions under certain conditions and directed the President to develop a comprehensive, multilateral strategy to bring democracy to, and improve quality of life and human rights practices in Burma. Id. at 369. President Clinton exercised the authority granted him by the statute and issued an executive order imposing further sanctions on Burma, prohibiting "new investment" in Burma by U.S. persons or entities and "generally incorporat[ing] the exceptions and exemptions addressed in the statute." Id. at 370.

It was against this federal backdrop that the Supreme Court scrutinized the Massachusetts law. Justice Souter's opinion for seven of the justices[4] concluded that "[b]ecause the state Act's provisions conflict with Congress's specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause." Id. at 388. The Court found that the state law undermined the purpose and natural effect of at least three provisions of the federal law: "its delegation of effective discretion to the President to control

---

[4] Justice Scalia, joined by Justice Thomas, concurred in the judgment only. See 530 U.S. at 388-391 (Scalia, J., concurring).

22

economic sanctions against Burma, its limitation of sanctions solely to United States persons and new investment, and its directive to the President to proceed diplomatically in developing a comprehensive, multilateral strategy toward Burma." Id. at 373-74. In other words, the state law weakened the President's discretion to calibrate economic sanctions against Burma using the authority conferred by Congress, and also displaced the President's exercise of that discretion by punishing conduct that the federal law permits and exceeding the "specific range" of pressure Congress intended to impose against the Burmese Government. Id. at 377.

All of the concerns animating the Supreme Court's decision in Crosby are present here -- and to a far greater degree. Undeniably, the Cuba Amendment conflicts with federal law in (at least) three ways: (1) the Cuba Amendment sweeps more broadly than the federal regime does, punishing companies like Odebrecht that do not run afoul of the federal Cuban sanctions and penalizing economic conduct that the federal law expressly permits; (2) the Cuba Amendment has its own substantial penalties that go beyond the federal sanctions; and (3) the Cuba Amendment undermines the substantial discretion Congress has afforded the President both to fine-tune economic sanctions and to pursue multilateral strategies with Cuba. We discuss each in turn.

**1.**

23

The Trading with the Enemy Act, which provides the statutory basis for the Cuban Assets Control Regulations, only applies to a "[p]erson . . . subject to the jurisdiction of the United States," 50 U.S.C. app. § 5(b)(1).  The CACR further define that term as follows:

> The term "person subject to the jurisdiction of the United States" includes:
>
> (a) Any individual, wherever located, who is a citizen or resident of the United States;
>
> (b) Any person within the United States as defined in § 515.330 [which, in relevant part, means a "person actually within the United States," 31 C.F.R. § 515.330(b)];
>
> (c) Any corporation, partnership, association, or other organization organized under the laws of the United States or of any State, territory, possession, or district of the United States; and
>
> (d) Any corporation, partnership, association, or other organization, wherever organized or doing business, that is owned or controlled by persons specified in paragraphs (a) or (c) of this section.

31 C.F.R. § 515.329.  The CACR thus apply to the following groups: U.S. citizens or residents, wherever located; any person located in the United States; any U.S. corporation; any corporation, wherever located, that is owned or controlled by a U.S. citizen or resident; and any corporation, wherever located, owned or controlled by a U.S. corporation (i.e. a foreign subsidiary of a U.S. corporation).[5]

---

[5] The statutes relating to Cuba do not have a materially different scope in terms of the entities covered.  The Cuban Democracy Act's prohibition on licensing import or export transactions between U.S.-owned or controlled foreign firms and Cuba, 22 U.S.C. § 6005(a)(1), explicitly

None of the federal sanctions reach as far as the Cuba Amendment.  The Amendment applies to any "company" that is "engaged in business operations in Cuba."  Fla. Stat. § 287.135(2).  Critically, a "company" for purposes of the Cuba Amendment is actually an entire corporate network, because it covers any "entity or business association, including all wholly owned subsidiaries, majority-owned subsidiaries, parent companies, or affiliates of such entities or business associations, that exists for the purpose of making profit."  Fla. Stat. § 215.473(c) (emphases added).

The Cuba Amendment plainly sweeps further than the federal regime because it imposes a penalty on a U.S. corporation like Odebrecht that does not itself do business with Cuba, but has a foreign parent company that does business with Cuba through an unrelated foreign subsidiary.  Or, in simpler terms, the Cuba Amendment penalizes U.S. companies for the business activities of their foreign parents or their foreign affiliates, no matter how remote the connection.  This squarely conflicts with the federal regime, which only sanctions U.S. companies for their own actions or the actions of their own subsidiaries.

---

cross-references the CACR provision on the subject, which applies to "U.S.-owned or controlled firms in third countries," 31 C.F.R. § 515.559.  Similarly, in the Libertad Act there are various provisions that apply to a "United States national," which is defined by the statute as "any United States citizen" or "any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States."  22 U.S.C. § 6023(15).  In other words, U.S. citizens and U.S. corporations.

The Cuba Amendment sweeps more broadly than the federal regime not only in the entities covered, but also in the conduct penalized. As we've noted, the federal regime, through licenses and exemptions, carves out from the Cuban sanctions certain categories of transactions with Cuba that are designed to support the Cuban people. These exceptions include the export to Cuba of published and informational material, agricultural commodities, drugs and medical devices, and telecommunications services. The Cuba Amendment plainly conflicts with federal law because it does not countenance any of the federal regime's exceptions. Any private company that engages in "business operations" in Cuba, or has a foreign parent company or affiliate that does so, is subject to the Cuba Amendment's restrictions. And "business operations," as defined in the Florida statute, means "engaging in commerce in any form in Cuba." Fla. Stat. § 287.135(1)(b) (emphasis added). No exceptions, no carve-outs for certain goods, services or transactions, no calibrated licensing system. The Cuba Amendment, in stark contrast to the federal regime, penalizes any commerce with Cuba -- no ifs, ands, or buts. Indeed, counsel for FDOT conceded in the district court that the Cuba Amendment has "no such exceptions where we say that certain types of contractual arrangements with Cuba would be accepted."

Thus the Cuba Amendment again squarely conflicts with the more nuanced federal regime. "Sanctions are drawn not only to bar what they prohibit but to

26

allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." Crosby, 530 U.S. at 380. Simply put, the Cuba Amendment conflicts with federal law "by penalizing individuals and conduct that Congress has explicitly exempted or excluded from sanctions." Id. at 378. This it may not do.

**2.**

The Cuba Amendment also conflicts with federal law because it imposes additional penalties on those companies that are subject to the federal sanctions. "Conflict is imminent when two separate remedies are brought to bear on the same activity." Crosby, 530 U.S. at 376 (internal quotation marks and alteration omitted). The Trading with the Enemy Act establishes the penalties for violating any of the federal Cuban sanctions. The statute provides for criminal penalties of up to 20 years' imprisonment and a $1,000,000 fine for a willful violation, and a civil penalty of up to $50,000 for a violation. 50 U.S.C. app. § 16(a), (b)(1). Any property that is the subject of a violation is subject to forfeiture in both the civil and criminal contexts. Id. app. § 16(b)(2), (c). In addition, any transfer of property in violation of the CACR is deemed null and void and cannot form the basis of an interest in the subject property. 31 C.F.R. § 515.203.

The administrative enforcement process is detailed more fully in the CACR. See 31 C.F.R. §§ 501.703 - 501.747. In addition, Appendix A to the CACR,

entitled "Economic Sanctions Enforcement Guidelines," "provides a general framework for the enforcement of all economic sanctions programs administered by the Office of Foreign Assets Control."  The guidelines detail a number of possible administrative responses to an apparent violation, ranging from No Action to Criminal Referral.  31 C.F.R. pt. 501 app. A, Part II (A)-(G).[6]  Part III of the guidelines sets forth general factors affecting the choice of which administrative action to pursue, including willfulness, concealment, pattern of conduct, prior notice, involvement of management, awareness of the violation, harm to the sanctions program's objectives, size of economic or other benefit conferred on the violator, commercial sophistication of the violator, and so on.  Id. app. A, Part III.

The Cuba Amendment plainly imposes additional penalties above and beyond the federal regime.  Prohibiting a company from bidding on state or local contracts in Florida is a substantial punishment, especially when applied to companies that may not even be in violation of the federal regime.  And the enforcement mechanism for this prohibition -- a "civil penalty equal to the greater of $2 million or twice the amount of the contract" and a three year ban on public contracting if a company files a false certification about its business relations with Cuba, Fla. Stat. § 287.135(5)(a) -- is considerably greater than the federal regime's

---

[6] The possible actions listed in the guidelines are No Action, Request Additional Information, Cautionary Letter, Finding of Violation, Civil Monetary Penalty, Criminal Referral, and Other Administrative Actions (which include License Denial, Suspension, Modification, or Revocation, or a Cease and Desist Order).

28

civil penalty of up to $50,000.  Indeed, the penalty is, at a <u>minimum</u>, twice as large as the <u>criminal</u> fine for willful violations of the federal sanctions.  The Cuba Amendment thus stands in sharp contrast to the federal calibration of appropriate penalties as well.

The Florida Department of Transportation concedes that the penalties imposed by the Cuba Amendment are different, but claims they penalize different conduct.  FDOT argues that companies are not being punished for doing business in Cuba, but rather for lying about it when they submit a false certification.  This purported distinction -- punishing the lie, not the trade conduct itself -- is unpersuasive.  It also fails to take into account that prohibiting companies like Odebrecht from bidding on Florida public contracts in the first place is itself a substantial punishment that exceeds the federal sanctions regime in both penalty and reach.  That punishment does not depend on any false certifications, only on business relations with Cuba by a company or by its foreign parent or affiliate.  FDOT's observation that the federal government also denounces the Castro regime and designates Cuba as a state sponsor of terrorism, while undeniably true, is of little help to the agency, because "[t]he fact of a common end hardly neutralizes conflicting means."  <u>Crosby</u>, 530 U.S. at 379-80 (citing <u>Gade</u>, 505 U.S. at 103).  Choosing "the right degree of pressure to employ" against the Castro regime is a "federal decision," <u>id.</u> at 380, not a decision for the State of Florida.

29

**3.**

The federal government has employed an extensive array of economic sanctions against Cuba for almost 50 years.  By any measure, the Cuban sanctions embodied in federal law are far more extensive than the federal sanctions leveled against Burma, which did not even exist at the time Massachusetts passed the selective procurement law before the Supreme Court in Crosby.  As we've noted, Congress has passed numerous statutes, the executive branch has promulgated the Cuban Assets Control Regulations, which are enforced by the Department of the Treasury, and the President has enormous discretion to calibrate the sanctions therein.  Significantly, the federal statutes also afford the President, in consultation with Congress, the discretion to waive sanctions and even terminate the embargo as Cuba transitions to a democratic government. See 22 U.S.C. §§ 6007, 6064.

The considerable discretion afforded the President has been amply evidenced by the periodic tightening and loosening of sanctions related to travel, enforcement levels, agricultural and medical supplies, remittances, and humanitarian aid.  In January 1999, President Clinton loosened some sanctions, announcing measures to support the Cuban people such as broadening cash remittances to Cuba to all U.S. residents, not just those with close relatives in Cuba; expanding direct flights to Cuba beyond just Miami; and loosening restrictions on travel to Cuba for certain travelers, such as professional researchers

and those involved in certain educational, religious, and sports activities. See Cuba Issues at 31. President Bush, on the other hand, emphasized stronger enforcement of economic sanctions and tightened the restrictions on travel, remittances, and humanitarian gift parcels to Cuba. See id. at 31-32. President Obama has, in turn, relaxed the restrictions on travel and remittances, allowing, for example, religious organizations to sponsor religious travel to Cuba and accredited institutions of higher education to sponsor travel to Cuba as well. President Obama has also allowed any U.S. person to send remittances to non-family members in Cuba to support private economic activity. See id. at 33-36. In other words, President Obama has largely restored President Clinton's policies, which had been tightened in the interim by President Bush. See id. at 36 ("In most respects, [President Obama's] new measures appear to be similar to policies that were undertaken by the Clinton Administration in 1999, but were subsequently curtailed by the Bush Administration in 2003 and 2004."). Plainly, Congress has reposed considerable power in the President to adjust our Nation's sanctions against the Cuban Government.

It is hard to dispute that the Cuba Amendment undermines the President's capacity to fine-tune these sanctions and to direct diplomatic relations with Cuba. "It is not merely that the differences between the state and federal Acts in scope and type of sanctions threaten to complicate discussions; they compromise the very

31

capacity of the President to speak for the Nation with one voice in dealing with other governments." Crosby, 530 U.S. at 381. The President's "maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." Id. (emphasis added). The Cuba Amendment creates a large "enclave[]" that the President can no longer offer in bargaining with Cuba: access to Florida's public contracting market, worth $8 billion a year at the state level alone, not counting local government contracts. Moreover, just like in Crosby, "the record is replete with evidence to answer any skeptics" about the undermining of national policy. Id. at 382. The negative foreign response to the Cuba Amendment has been similar to the negative foreign response to Massachusetts's Burma law. In Crosby, the Supreme Court noted that the EU and Japan diplomatically protested the Massachusetts law and lodged formal complaints in the WTO. Id. at 382-83. Here, as we've noted, numerous foreign powers, including Canada, Brazil, the European Union, and Norway have all lodged protests against the Cuba Amendment through various diplomatic channels and through the WTO.

The conflict between state and federal law is all the more apparent because the President is acting at the zenith of his power when he exercises the discretion afforded him by Congress to direct our Nation's economic policy towards Cuba.

As Justice Jackson observed over sixty years ago, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Moreover, the President's power in the area of foreign relations is already among his most substantial, because in the "vast external realm" of foreign affairs, "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 319 (1936). Thus, we are especially mindful of state laws that might undermine the exercise of the President's large discretion in this area.

Plainly, the Cuba Amendment is such a law. It exceeds the scope of the federal Cuban sanctions in numerous ways, as we have explained. Moreover, the federal laws related to Cuba demonstrate a "plentitude of Executive authority" to "exercise economic leverage" against the Castro regime. Crosby, 530 U.S. at 375-76. It was precisely this "plentitude of Executive authority" that the Supreme Court found "controls the issue of preemption," because "[t]he President has been given this authority not merely to make a political statement but to achieve a political result, and the fullness of his authority shows the importance of the congressional mind of reaching that result." Id. at 376. The federal laws empower

33

the President to engage in a multilateral approach to Cuba, with economic sanctions designed to weaken the Castro regime but with notable exceptions to support the Cuban people. The enforcement of the Cuba Amendment overrides the nuanced federal policy and creates a large enclave that the President can no longer access. As the Supreme Court explained, "[i]t is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action." Id. As we see it, the Cuba Amendment "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in its delegation of discretionary authority to the President, as well as its own legislation on Cuban sanctions, including the Cuban Democracy Act and the Helms-Burton Act. Id. at 373 (quoting Hines, 312 U.S. at 67).

## C.

The State tries to get around the Supreme Court's controlling precedent and the clear conflict between state and federal law in a few ways. First, the Department argues that the State's choice of how to allocate and spend public funds is a basic aspect of its sovereignty that should be immune or nearly immune from judicial review and not amenable to preemption analysis. But the preempted state law before the Supreme Court in Crosby was also a spending law involving

34

the use of state funds in public contracting.  Indeed, this exact argument was briskly rejected by the Court:

> We add that we have already rejected the argument that a State's "statutory scheme . . . escapes pre-emption because it is an exercise of the State's spending power rather than its regulatory power." <u>Wisconsin Dept. of Industry v. Gould, Inc.</u>, 475 U.S. 282, 287, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986).  In <u>Gould</u>, we found that a Wisconsin statute debarring repeat violators of the National Labor Relations Act, 29 U.S.C. § 151 <u>et seq.</u>, from contracting with the State was preempted because the state statute's additional enforcement mechanism conflicted with the federal Act.  475 U.S., at 288–289, 106 S.Ct. 1057.  The fact that the State "ha[d] chosen to use its spending power rather than its police power" did not reduce the potential for conflict with the federal statute.  <u>Ibid.</u>

530 U.S. at 373 n.7 (alterations in original).

The Department also says that our own post-<u>Crosby</u> decision in <u>Faculty Senate of Florida International University v. Winn</u>, 616 F.3d 1206 (11th Cir. 2010), is controlling.  In <u>Faculty Senate</u>, a panel of this Court upheld portions of Florida's Travel Act, Fla. Stat. §§ 112.061(3)(e), 1011.90(6), which restricted state universities from spending funds given to them by the State on travel to a country designated by the United States Department of State as a state sponsor of terrorism, which includes Cuba.  The panel "presume[d] that the State can validly legislate on spending and on education matters," but recognized that "these traditional state concerns could be overridden" in the event of a clear conflict with federal law or policy.  616 F.3d at 1208.  However, the Florida statute's "brush with federal law and the foreign affairs of the United States [was] too indirect, minor, incidental,

35

and peripheral to trigger the Supremacy Clause's-undoubted-overriding power." Id. Given "the lack of the conflict's clarity and severity," the strength of Florida's interest in managing its own education spending and funding of its employees' travel was sufficient to overcome any nebulous conflict with federal policy. Id. at 1211.

We distinguished Crosby because Florida, in passing its Travel Act, did not "unilaterally select[] by name a foreign country on which it ha[d] declared, in effect, some kind of economic war." Id. at 1210. In addition, Florida's law neither prohibited nor penalized anyone for traveling anywhere. See id. Importantly, Florida's law also did "not attempt to prohibit, or even to obstruct, trading broadly by anyone with anyone." Id. Although not willing to hold it relevant, the panel also noted that the economic impact was likely minimal. See id. & n.10 (observing that, from 2001-2006, the Cuban Research Institute at Florida International University spent $125,511 on direct travel expensed to and from Cuba, and remarking that such sums likely "are not big enough to be of serious concern on the world stage").

Faculty Senate is readily distinguishable, for all of the same reasons the panel in that case distinguished it from Crosby. The Cuba Amendment creates more than a minor or incidental brush with federal law. Unlike in Faculty Senate, the Cuba Amendment absolutely involves Florida "select[ing] by name a foreign

36

country" -- Cuba -- and imposing an economic sanction on companies that do business there and even on companies that are only distantly affiliated with companies that do business there. Id. at 1210. The Cuba Amendment absolutely is intended to "prohibit" or "obstruct" domestic and foreign companies' trade with Cuba. Id.; see also id. at 1209 (noting that "[t]he obvious idea" of the state law at issue in Crosby "was to reduce trade across-the-board with Burma"). And Florida's $8 billion-a-year public contracting market absolutely is "big enough to be of serious concern on the world stage." Id. at 1210 n.10. Indeed, it is four times the size of the public contracting market at issue in Crosby, and several foreign powers have already expressed serious concerns, even though the Amendment has never gone into operation.

In short, Odebrecht has demonstrated a substantial likelihood of success on its claim that the Cuba Amendment is preempted by federal law. The Cuba Amendment conflicts with federal law in several ways, and undermines the full purposes and objectives of the extensive and nuanced federal Cuban sanctions regime. It therefore runs afoul of the Supremacy Clause, U.S. Const. art. VI, cl. 2, and must yield to federal law.[7]

---

[7] Because we hold that the Cuba Amendment is unconstitutional on grounds of conflict preemption, we have no occasion to separately address Odebrecht's claims that the statute violates principles of field preemption, violates the Foreign Affairs Power, and violates the Foreign Commerce Clause. Cf. Crosby, 530 U.S. at 374 n.8 ("Because our conclusion that the state Act conflicts with federal law is sufficient to affirm the judgment below, we decline to

37

**III.**

In addition to showing a substantial likelihood of success on the merits, Odebrecht was also required to demonstrate that it would suffer irreparable harm absent an injunction, that the harm would exceed the harm suffered by the State if the injunction is issued, and that an injunction would not disserve the public interest. See Grizzle, 634 F.3d at 1320; N. Am. Med., 522 F.3d at 1217.

The Department says that Odebrecht failed on each count. It claims that Odebrecht has not successfully bid on a contract with FDOT in fifteen years and thus is not a serious contender in the bidding process, that Odebrecht has failed to identify with particularity how the Cuba Amendment has affected its ability to form partnerships and retain employees, that the people of Florida have a strong interest in the enforcement of the Cuba Amendment that outweighs any harm to Odebrecht, and that enforcement of the Cuba Amendment is in the public interest because it does not impose upon the federal government's foreign policy towards Cuba. These arguments miss the mark.

For starters, Odebrecht would suffer irreparable harm absent an injunction. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)

---

speak to field preemption as a separate issue, or to pass on the First Circuit's rulings addressing the foreign affairs power or the dormant Foreign Commerce Clause." (citation omitted)).

(quoting <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974)).  The injury must be actual and imminent, not remote or speculative.  <u>Id.</u>  Odebrecht has met this standard.  It alleges three harms that are both actual and imminent: (1) the loss of its right to bid on public contracts, including the FDOT contracts that it has been prequalified to bid on, up to the sizable amount of $1.8 billion; (2) the loss of revenues and profits from contracts it can no longer bid for; and (3) interference with its ability to partner with other firms and retain employees.  The substantial nature of the first harm cannot be overstated.  Around 80% of Odebrecht's revenues over the years have come from public contracts in the State of Florida, and 100% of its revenues in 2011 did so.

FDOT's only response is to say that Odebrecht has not successfully bid on a FDOT contract in fifteen years.  The argument is flawed.  First of all, FDOT does not explain why we should look only at FDOT contracts, as opposed to public contracts more broadly.  The Cuba Amendment applies to <u>all</u> state agencies as well as <u>all</u> county and municipal governments in the State of Florida.  <u>See</u> Fla. Stat. § 287.135(1)(c), (2).   And the record demonstrates that Odebrecht is doing substantial business in the State of Florida.  As we've noted, in 2011, <u>100%</u> of Odebrecht's revenues, amounting to over $200 million, were derived from state and local public contracts in Florida.  Indeed, in the last ten years, Odebrecht and its joint venture partners have completed or are still in the process of completing

39

nine major contracts, worth a total of $3.3 billion, with Florida state agencies and local governments. One of those major contracts came as recently as May 2012, when Broward County awarded an Odebrecht joint venture a $226 million runway expansion project at the Fort Lauderdale Airport. There is no dispute that if the Cuba Amendment were in effect, Odebrecht would not have been able to bid on any of these contracts. In other words, if the Cuba Amendment were enforced against Odebrecht, almost its entire revenue stream would simply evaporate, causing Odebrecht substantial economic harm.

Moreover, even if we limited our analysis to the Florida Department of Transportation alone, the record shows that Odebrecht intended to bid on or pursue several high-value FDOT contracts, and that FDOT had prequalified it to do so, up to $1.8 billion. The contracts Odebrecht intended to bid on include an estimated-$265 million project on the Palmetto Expressway and an estimated-$870 million project on Interstate 75. Odebrecht's loss of an opportunity to bid on contracts like these is itself an injury, although Odebrecht is not assured of actually winning any given contract. As the Supreme Court has recognized in the context of standing to bring an equal protection challenge, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993); accord id. ("To establish standing, therefore, a party . . . need

40

only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."). Although it arose in a slightly different context, we find the Supreme Court's reasoning instructive. Odebrecht's intent and ability to bid on FDOT and other public contracts are neither speculative nor remote, Odebrecht would be harmed by the loss of an opportunity to bid on these contracts, and thus, even if we artificially limited our focus to the Florida Department of Transportation alone, Odebrecht still would be actually injured if the Cuba Amendment were to go into effect.

These harms to Odebrecht absent an injunction are not only actual and imminent, they are also irreparable. Odebrecht has no monetary recourse against a state agency like FDOT because of the Eleventh Amendment. "[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." Kentucky v. Graham, 473 U.S. 159, 169 (1985). This includes damages claims against State officials in their official capacity. Id. It is also clear that there has been no waiver or congressional override; indeed, the Supreme Court "has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity." Id. at 169 n.17 (citing Quern v. Jordan, 440 U.S. 332 (1979); Edelman v. Jordan, 415 U.S. 651 (1974)). Ex Parte Young suits like the one brought here have never been held to permit retrospective monetary damages. See Fla. Ass'n of Rehabilitation Facilities, Inc.

41

v. Fla. Dep't of Health & Rehabilitative Servs., 225 F.3d 1208, 1220 (11th Cir. 2000) ("[T]he Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages."). In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable. See, e.g., Chamber of Commerce v. Edmondson, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); Iowa Utils. Bd. v. FCC, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss . . . qualif[ies] as irreparable harm."); ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1310 (S.D. Fla. 2008) ("In the case at bar, Plaintiffs face serious economic harm as a result of the Travel Act Amendments and cannot sue the state of Florida for damages. Therefore, this harm is irreparable as a matter of law.").

The other equitable requirements are easily satisfied. Odebrecht would suffer substantial injury in the loss of its ability to bid on state and local public contracts throughout Florida if the Cuba Amendment were to go into effect. On the flip side, the State is not harmed much, if at all, by the injunction. Indeed, an injunction against enforcement of the Cuba Amendment allows for greater

42

competition in bidding, which <u>decreases</u> the State's overall costs. The only harm to the State is the more nebulous, not easily quantified harm of being prevented from enforcing one of its laws. That harm is present every time the validity of a state law is challenged, and it is far outweighed by the economic harm to Odebrecht and other companies that would be prevented from bidding on public contracts in Florida were the Cuba Amendment to go into effect.

Finally, and relatedly, the State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute. As a panel of this Court recently explained, "[f]rustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." <u>United States v. Alabama</u>, 691 F.3d 1269, 1301 (11th Cir. 2012). In short, the injunction did not disserve the public interest.

We have little difficulty concluding that Odebrecht has demonstrated a substantial likelihood of success on its claim that the Cuba Amendment is preempted by the extensive federal Cuban sanctions regime. The Amendment reaches far beyond the federal law in numerous ways and undermines the President's exercise of the discretion afforded him by Congress to direct our Nation's economic policy towards Cuba. In addition, the equities strongly favor a preliminary injunction prohibiting the enforcement of the Cuba Amendment.

**AFFIRMED.**