HIGGINSON, Circuit Judge,
joined by CARL E. STEWART, Chief Judge, and W. EUGENE DAVIS, LESLIE H. SOUTHWICK, and HAYNES, Circuit Judges.
“America’s history has long been a story of immigrants.”[1] That story, a complicated history of inclusion and exclusion,[2] has unfolded according to law, but also contrary to law. See Ex parte Kumezo Kawato, 317 U.S. 69, 73-74, 63 S.Ct. 115, 87 L.Ed. 58 (1942) (the United States is “a country whose life blood came from an immigrant stream.”). As the Supreme Court has emphasized — and indeed, as a constitutional imperative — a country’s treatment of non-citizens within its borders can gravely affect foreign relations. Hines v. Davidowitz, 312 U.S. 52, 62-68, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Arizona v. United States, — U.S.-, 132 S.Ct. 2492, 2498-99, 183 L.Ed.2d 351 (2012) (“It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.”).
The Ordinance at issue in this ease and passed by the active citizens of the City of Farmers Branch (“Farmers Branch”) seeks to regulate non-citizens who reside in the United States contrary to law. Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex., 701 F.Supp.2d 835, 861 (N.D.Tex.2010). Farmers Branch classifies these non-citizens as persons “not lawfully present in the United States.” Id. at §§ 1(D)(2); 3(D)(2). Responding to an “aroused popular consciousness,” Baker v. Carr, 369 U.S. 186, 270, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (Frankfurter, J., dissenting), and frustration at the perceived lack of federal enforcement of immigration law, Farmers Branch sought to “prevent” such persons from renting housing in the city. The district court concluded, inter alia, that the Ordinance was conflict preempted under federal law. Villas at Parkside Partners, 701 F.Supp.2d at 861. Because we hold that the Ordinance’s criminal offense and penalty provisions and its state judicial review process conflict with federal law, we AFFIRM the judgment of the district court.
1. Farmers Branch, Texas, Ordinance 2952
Ordinance 2952 sets forth licensing provisions and criminal sanctions. The Ordinance requires individuals to obtain a license before occupying a rented apartment or “single-family residence.” Ordinance 2952 at §§ 1(B)(1); 3(B)(1). For persons not declaring themselves citizens or nationals of the United States, Farmers Branch’s building inspector must verify “with the federal government whether the occupant is an alien lawfully present in the United States.” Id. at §§ 1(D)(1); 3(D)(1). Upon such inquiry, if the federal government twice “reports” that the occupant is “not lawfully present in the United States,” then the building inspector must revoke the occupant’s license after notifying both the occupant and the landlord. Id. at §§ l(D)(l)-(4); 3(D)(l)-(4). The Ordinance provides that “[a]ny landlord or occupant who has received a deficiency *527 notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.” Id. at §§ 1(E)(1); 3(E)(1).
The Ordinance’s criminal provisions prohibit persons from occupying a rented apartment or single-family residence without first obtaining a valid license, id. at §§ 1(C)(1); 3(C)(1); 5, and making a false statement of fact on a license application, id. at §§ 1(C)(2); 3(C)(2); 5. Landlords, in turn, are prohibited from renting an apartment or single-family residence without obtaining licenses from the occupants, id. at §§ 1(C)(4); 3(C)(4); 5, failing to maintain copies of licenses from all known occupants, id. at §§ 1(C)(5); 3(C)(5); 5, failing to include a lease provision stating that occupancy by a person without a valid license constitutes default, id. at 1(C)(6); 3(C)(6); 5, and allowing an occupant to inhabit an apartment without a valid license, id. at 1(C)(7); 3(C)(7); 5. If a landlord commits the criminal offense of knowingly permitting an occupant to remain in an apartment or single-family residence without a valid license, id. at §§ 1(C)(7); 3(C)(7), then the building inspector shall suspend the landlord’s rental license until the landlord submits a sworn affidavit stating that the occupancy has ended, id. at §§ (D)(5)-(7); (D)(5)-(7). A landlord may appeal the suspension of a rental license to the city council. Id. at §§ 1(D)(8); 3(D)(8). The Ordinance also criminalizes creating, possessing, selling or distributing a counterfeit license. Id. at §§ 1(C)(3), 3(C)(3), 5.
These seven offenses are Class C criminal misdemeanors punishable by a fine of $500 upon conviction, see Tex. Penal Code Ann. § 12.41(3) (West 2009); State v. Chacon, 273 S.W.3d 375, 377 n. 2 (Tex.App.2008); Ordinance 2952 at §§ 1(C); 3(C); 5, with a separate offense deemed committed each day that a violation occurs or continues, id. at § 5. In Texas, local police may make arrests for Class C misdemeanors. See Tex.Code Crim. Proc. Ann. art. 14.01(b), 14.06(a)-(b) (West 2011).
II. Supremacy Clause Litigation and the Supreme Court’s Intervening Decision in Arizona v. United States
Two groups of plaintiffs, 0 comprised of landlords and tenants, sued the City, seeking to enjoin the Ordinance. Villas at Parkside Partners v. City of Farmers Branch, 701 F.Supp.2d 835 (N.D.Tex.2010). The district court found the Ordinance to be preempted under the Supremacy Clause, both as an improper regulation of immigration because it “applies federal immigration classifications for purposes not authorized or contemplated by federal law,” id. at 860; see generally DeCanas v. Bica, 424 U.S. 351, 355, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), and also as an obstacle to the “comprehensive federal” scheme for “removing aliens or adjudicating their status for that purpose,” which the district court described as “structured, in part, to allow federal discretion and to permit in appropriate circumstances a legal adjustment in an alien’s status,” id. at 860-61. The district court therefore granted summary judgment to the plaintiffs on their Supremacy Clause claim and permanently enjoined enforcement of the Ordinance. Id. at 860-61.
After a panel of our court affirmed the district court judgment, Villas at Parkside Partners v. City of Farmers Branch, 675 F.3d 802 (5th Cir.2012), the Supreme Court issued its decision in Arizona, 132 S.Ct. 2492, which comprehensively set forth the reasons why federal law preempted various provisions of Arizona law relating to non-citizens. That case concerned a Supremacy Clause challenge to various sections of an Arizona law known as S.B. 1070 that was enacted with the stated purpose of “ ‘discouraging] and *528 deter[ring] the unlawful entry and presence of aliens’ ” by “establishing] an official state policy of ‘attrition through enforcement.’ ” Arizona, 132 S.Ct. at 2497; cf. Arizona v. Inter Tribal Council of Arizona, Inc., — U.S.-, 133 S.Ct. 2247, 186 L.Ed.2d 239 (2013). The Court’s Arizona decision instructs our decision today.
The Supremacy Clause provides that federal law “shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. The Court in Arizona reiterated that in the absence of an express preemption provision, a state or local law may be required to “give way to federal law” under at least two circumstances: field and conflict preemption. Arizona, 132 S.Ct. at 2501.[3] First, states and localities may not “regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.” Id. “The intent to displace state law altogether can be inferred from a framework of regulation ‘so pervasive ... that Congress left no room for the States to supplement it’ or where there is a ‘federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.’ ” Id. (alterations in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).
Second, state and local laws are preempted “when they conflict with federal law.” Id. “This includes cases where ‘compliance with both federal and state regulations is a physical impossibility,’ and those instances where the challenged state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” Id. (citing Hines, 312 U.S. at 67, 61 S.Ct. 399). “What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.” Id. (quoting Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)). In preemption analysis, we “assume that ‘the historic police powers of the States’ are not superseded ‘unless that was the clear and manifest purpose of Congress.’ ” Id. (quoting Rice, 331 U.S. at 230, 67 S.Ct. 1146).
III. Standard of Review
Generally, we review a district court’s grant of a permanent injunction for abuse of discretion. Peaches Enter. Corp. v. Enter. Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir.1995). However, we review the “ultimate issue” in this case — the district court’s grant of summary judgment on preemption grounds — de novo. VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir.2006); Baker v. Farmers Elec. Coop., Inc., 34 F.3d 274, 278 (5th Cir.1994).
IV. Conflict Preemption
We conclude that enforcement of the Ordinance conflicts with federal law. See Arizona, 132 S.Ct. at 2501. Conflict exists despite Farmers Branch’s argument that its Ordinance establishes “concurrent enforcement” of federal immigration law, as “[t]he fact of a common end hardly neutralizes conflicting means.” Crosby, 530 U.S. at 379, 120 S.Ct. 2288. By setting forth criminal offenses that “discourage illegal immigration or otherwise reinforce federal immigration law,” and by providing *529 for state judicial review of a non-citizen’s lawful or unlawful presence, the Ordinance creates such conflict. Ordinance 2952 at §§ 1(C); 1(E); 3(C); 3(E); 5.
A. Criminal Offense Provisions
Applying Arizona, we hold that Farmers Branch’s establishment of new criminal offenses based on the housing of non-citizens “disrupts] the federal [immigration] framework,” Arizona, 132 S.Ct. at 2509, both by interfering with federal anti-harboring law and, by allowing state officers to “hold[ ] aliens in custody for possible unlawful presence without federal direction and supervision.” Id.; of. id. at 2499 (“The dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation’s foreign policy.”); see also Ga. Latino Alliance for Human Rights v. Georgia, 691 F.3d 1250 (11th Cir.2012), reh’g en banc denied, No. 11-13044 (11th Cir. Nov. 27, 2012); United States v. Alabama, 691 F.3d 1269 (11th Cir.2012), cert. denied, 569 U.S. -, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013) (No. 12-884).
1. Offenses Applying to Landlords
Farmers Branch claims its Ordinance will concurrently enforce federal anti-harboring law by providing “a different mechanism against the same ... conduct” criminalized by the federal government. Ordinance 2952, pmbl. As the Supreme Court has cautioned, however, “conflict is imminent” when “two separate remedies are brought to bear on the same activity.” Crosby, 530 U.S. at 380, 120 S.Ct. 2288 (quoting Wisconsin Dep’t of Indus, v. Gould, Inc., 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)). Here, “examining the federal statute as a whole and identifying its purpose and intended effects,” we conclude that the Ordinance stands as an obstacle to “the accomplishment and execution of the full purposes and objectives” of Congress. See id. at 373, 120 S.Ct. 2288.[4]
It is a federal felony for any person, “knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law,” to “conceal[], harbor[], or shield[ ] from detection ... such alien in any place, including any building.” 8 U.S.C. § 1324(a)(l)(A)(iii). In enacting this provision, Congress “intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien’s remaining in the United States illegally----” United States v. Rubio-Gonzalez, 674 F.2d 1067, 1073 n. 5 (5th Cir.1982). To that end, we have interpreted the statutory phrase “harbor, shield, or conceal” to imply that “something is being hidden from detection.” United States v. Varkonyi, 645 F.2d 453 459 (5th Cir.1981).[5]
*530 The Ordinance’s criminal provisions, by contrast, do not require that a landlord know or recklessly disregard a renter’s violation of federal law, nor that a landlord shield the renter’s presence from detection, adjudication, and potential removal by the federal government. Ordinance 2952 at §§ 1(C)(7); 3(C)(7). Instead, the Ordinance criminalizes a landlord’s mere renting of an apartment to a non-citizen found to be “not lawfully present in the United States.” Id. at §§ 1(C)(7), 1(D)(4); 3(C)(7), 3(D)(4). “As a general rule, it is not a crime for a removable alien to remain present in the United States.” Arizona, 132 S.Ct. at 2505. Persons who remain here while removable are not necessarily evading federal detection; in fact, federal law not only contemplates a non-citizen’s residence in the United States until potential deportation, but also requires the non-citizen to provide a reliable address to the federal government to guarantee and speed the removal process. See 8 U.S.C. § 1229(a)(l)(F)(I) (during removal proceedings, written notice “shall be given in person to the alien ... specifying ... [t]he requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted.”); see also Arizona, 132 S.Ct. at 2504.[6] Farmers Branch’s prohibition on renting to non-citizens here contrary to law thus not only fails to facilitate, but obstructs the goal of bringing potentially removable non-citizens to the attention of the federal authorities.[7]
Several additional features of 8 U.S.C. § 1324 further illustrate this conflict.[8] First, the federal government retains sole authority under the statute to prosecute, convict, and sentence offenders. The statute grants state officers one role: to make arrests for violations of the proscribed federal crimes. 8 U.S.C. § 1324(c). The Court in Arizona categorized this grant of authority under § 1324(c) as one of several “specific limited circumstances” in which federal law allows state officers to “perform the functions of an immigration officer ... subject to the Attorney General’s direction and supervision” under 8 U.S.C. § 1357(g)(3). Arizona, 132 S.Ct. at 2506. Second, to show that a federal criminal *531 violation has occurred, “the prosecution must prove” in federal court “that the alien, who is transported or harbored by the defendant, ‘has come to, entered, or remains in the United States in violation of the law,’” United States v. Esparza, 882 F.2d 143, 145 (5th Cir.1989) (quoting United States v. Rivera, 859 F.2d 1204, 1209 (4th Cir.1988)), using statutorily limited categories of prima facie evidence: “records of any judicial or administrative proceeding,” “official records of the [USCIS] or of the Department of State,” and “testimony by an immigration officer,” 8 U.S.C. § 1324(b)(3); cf. Arizona, 132 S.Ct. at 2529 (“Arizona could also provide officers with a nonexclusive list containing forms of identification sufficient under § 2(B) to dispel any suspicion of unlawful presence.”) (Alito, J., concurring in part and dissenting in part). We have held, for the purpose of proving the analogous crime of transporting certain non-citizens, that “[t]he aliens’ status is an element of the crime.” United States v. Alvarado-Machado, 867 F.2d 209, 212 (5th Cir.1989). The “significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable,” Arizona, 132 S.Ct. at 2506, reinforce the importance of the federal government’s supervisory role over the limited contexts, including harboring, where the Attorney General has delegated arrest authority to state officers. Id. We conclude that, by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the “limited circumstances” specified by federal law, the Ordinance “interfere^ with the careful balance struck by Congress” with respect to the harboring of non-citizens here contrary to law. See Arizona, 132 S.Ct. at 2505-06; see also Crosby, 530 U.S. at 367, 120 S.Ct. 2288; Odebrecht Constr., Inc. v. Sec’y, Fla. Dep’t of Transp., 715 F.3d 1268, 1282-83 (11th Cir.2013).[9]
2. Offenses Applying to Non-Citizen Renters
Another stated purpose of the Ordinance was to “aid in [the] enforcement” of the federal law providing — in the Ordinance’s words — that “certain aliens not lawfully present in the United States are not eligi *532 ble for certain State and local public benefits, including licenses.” Ordinance 2952, pmbl. (citing 8 U.S.C. § 1621 et seq.) Farmers Branch criminalizes occupying an apartment or single-family residence without first obtaining a valid occupancy license. Ordinance 2952 §§ 1(C)(1); 3(C)(3); 5.[10] But unlike the criminal provisions of the employment laws upheld in DeCanas and Whiting, which applied only “to individuals whom the Federal Government has already declared cannot work in this country,” DeCanas, 424 U.S. at 363, 96 S.Ct. 933; see also Whiting, 131 S.Ct. at 1981 (specifying that the Arizona law adopted the precise federal definition of “unauthorized alien” under 8 U.S.C. § 1324a(h)(3)), the Ordinance predicates arrests, detentions, and prosecutions based on a classification — the ability to obtain rental housing — that does not exist under § 1621 or anywhere else in federal law.[11] Cf. Plyler v. Doe, 457 U.S. 202, 212 n. 19, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (“[I]f the federal government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.”).
Significantly, in remanding the conflict preemption inquiry to the state court, the Court in DeCanas noted California’s concession that if its law reached aliens with employment authorization but without lawful status, it would be facially unconstitutional. DeCanas, 424 U.S. at 364, 96 S.Ct. 933. In this case, Farmers Branch’s Ordinance reaches non-citizens who may not have lawful status but face no federal exclusion from rental housing, and exposes those non-citizens to arrests, detentions, and prosecutions based on Farmers Branch’s assessment of “unlawful presence.” The Ordinance not only criminalizes occupancy of a rented apartment or single-family residence, but puts local officials in the impermissible position of arresting and detaining persons based on their immigration status without federal direction and supervision. See Arizona, 132 S.Ct. at 2505.
Farmers Branch argues that the building inspector’s “unlawful presence” inquiry is no different from those inquiries “made by hundreds of local governments daily to the federal government to ascertain immigrants’ status and qualifications for benefits ranging from housing assistance to student loans to medical care and disability income.” In those instances, however, the federal government has set out specific *533 and carefully calibrated categories of non-citizens who qualify for such benefits. See, e.g., 8 U.S.C. § 1641(b) (defining “qualified alien,” for the purpose of conditioning federal, state, and local public benefits, as a member of one of seven enumerated classes, or “an alien who has been battered or subjected to extremely cruelty” by a household member); REAL ID Act, Pub.L. No. 109-13, 119 Stat. 231, § 202(c)(2)(B) (May 11, 2005) (conditioning the grant of state identification such as driver’s licenses on an applicant’s membership in one of eight enumerated classes of immigration status); 8 C.F.R. § 274a.l2 (setting forth the specific “[classes of aliens authorized to accept employment” pursuant to federal statutes and regulations); Definition of the Term Lawfully Present in the United States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law 104-193, 61 Fed.Reg. 47,039 (Sept. 6, 1996) (defining a non-citizen “lawfully present” as falling under one of five particular immigration classifications, and providing that the definition of lawful presence “is made solely for the purpose of determining an alien’s eligibility for payment of title II social security benefits ... and is not intended to confer any immigration status or benefit under the Immigration and Nationality Act”).
While federal law provides carefully calibrated definitions of the term “qualified alien” for the purpose of conferring benefits, the Ordinance does not specify which of many federal immigration classifications Farmers Branch officials would use to resolve whether a non-citizen was “lawfully present.” The Ordinance’s “generality stands at odds with the federal discreteness.” Crosby, 530 U.S. at 379, 120 S.Ct. 2288; see also Odebrecht, 715 F.3d at 1281-82 (finding that a state law “squarely conflicts with the more nuanced federal regime” because “in stark contrast to the federal regime, [the state law] penalizes any [conduct] — no ifs, ands, or buts.”). Indeed, because federal law does not limit the ability of non-citizens to obtain rental housing,[12] there is no definition that would be applicable to Farmers Branch’s inquiry.[13]
While Farmers Branch officials testified that they intended to use the federal SAVE program to determine lawful presence, the chief of that program testified that SAVE can provide only a non-citizen’s specific immigration status; it “does not answer lawful presence or not.”[14] Farm *534 ers Branch’s building inspector testified that because an inquiry to the federal government would reveal only an applicant’s immigration status, he himself would “have to make that determination [of whether the applicant is] lawfully present.” Considering the labyrinth of statutes and regulations governing the classification of non-citizens, and the necessity for over 260 immigration judges to oversee individual cases, however, it is unsurprising that the building inspector also confusedly disclaimed that adjudicatory capacity, stating that: “[the decision of lawful presence] will rest with the people that give us the information that it may have told us what that status is.”
Based on a classification that does not exist in federal law, Farmers Branch has criminalized the occupancy of rental housing by those non-citizens found to be “not lawfully present.” Ordinance 2952 §§ 1(C)(1); 3(C)(3); 5. Texas law allows local officers to arrest and detain individuals for Class C misdemeanors. Texas Code Crim. Proc. art. 14.01; 14.06; 15.17.
The Supreme Court in Arizona invalidated a state law provision (“Section 6”) allowing state officers to “without a warrant ... arrest a person if the officer has probable cause to believe ... [the person] has committed any public offense that makes [him] removable from the United States.” Arizona, 132 S.Ct. at 2505. The Court held that Section 6 “violates the principle that the removal process is entrusted to the federal government” by allowing state authorities to arrest and detain based on immigration status without prior federal “direction and supervision.” Id. at 2506-07. The Ordinance puts local officers in this impermissible position.
Indeed, Farmers Branch’s Ordinance authorizes more interference with federal law than did the Arizona arrest-only authority invalidated by the Court. As dissenting Justices in Arizona emphasized, Section 6 allowed state officers to bring persons to the attention of federal authorities for further action, whereas the Ordinance allows for local authorities to prosecute as well as arrest based on perceived unlawful presence. Cf. Arizona, 132 S.Ct. at 2516 (noting that the Arizona statute authorized state arrests but contemplated “following] their [federal] lead on what to do next”) (Scalia, J., concurring in part and dissenting in part); id. at 2517 (highlighting that “Arizona is entitled to arrest them and at least bring them to federal officials’ attention, which is all that § 6 necessarily entails. (In my view, the State can go further than this, and punish them for their unlawful entry and presence in Arizona.)”) (Scalia, J., concurring in part and dissenting in part); id. at 2527 (“[T]he Federal Government retains the discretion that matters most — that is, the discretion to enforce the law in particular cases”; “the Federal Government decides, presumably based on its enforcement priorities, whether to have the person released or transferred to federal custody.”) (Alito, J., concurring in part and dissenting in part).
Although federal law does allow state officers to “cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,” 8 U.S.C. § 1357(g)(10)(B), the Supreme Court has held that “unilateral state action to detain” goes beyond any “coherent understanding of the term” “cooperation” under federal law. Arizona, 132 S.Ct. at 2507 (providing examples of “cooperation” as “participating in a joint task force with federal officers, providing operational support in executing a warrant, or allowing federal immigration officials to gain access to detainees held in state facilities.”). The Ordinance conveys such unilateral state authority to prosecute as well as to detain. Allowing state officers to arrest an individual whom they *535 believe to be not lawfully present “would allow the State to achieve its own immigration policy” and could be “unnecessary harassment of some aliens ... whom federal officials determine should not be removed.” Id. at 2506.
The Ordinance is distinguishable from the section of the Arizona law upheld by the Court, which allows state officers to make a “reasonable attempt ... to determine the immigration status of any person they stop, detain, or arrest on some other legitimate basis if reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.” Id. at 2507. The Court upheld that provision only after finding that the law, on its face, did not require officers to prolong detention for the purpose of conducting an immigration status check. Id. at 2509. Farmers Branch’s Ordinance, by contrast, allows for arrests, detentions, and prosecutions predicated on an occupant’s failure to obtain a rental license, and the denial of such a license is in turn based on Farmers Branch’s immigration status inquiry. See Ordinance 2952 at §§ 1(C); 3(C).[15]
The Supreme Court clarified that “it would disrupt the federal framework to put state offices in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision.” Arizona, 132 S.Ct. at 2509. Farmers Branch argues that the Ordinance relies entirely on the federal determination of lawful or unlawful presence. But even a determinative federal answer on this question — which, as explained above, would be impossible to obtain— would not bring the Ordinance’s arrest procedures into compliance with federal law. “The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process.” Id. at 2505. Without a federal warrant, federal officers have even more limited authority to arrest. Id. at 2506 (citing 8 U.S.C. § 1357(a)). The Ordinance’s criminal provisions exist outside this statutory structure.[16] For these reasons, we conclude that the Ordinance’s criminal provisions, *536 because they conflict with federal anti-harboring law and the federal authority to arrest and detain persons for possible unlawful presence, are preempted by federal law.
B. State Judicial Review
The Ordinance also provides that “[a]ny landlord or occupant who has received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.” Ordinance 2952 at §§ 1(E)(1); 3(E)(1). A landlord or occupant may seek state judicial review of two questions: first, whether the building inspector complied with the law, and second, “whether the occupant is lawfully present in the United States.” Id. at §§ 1(E)(3); 3(E)(3). In a suit over the latter question, the Ordinance indicates that “that question shall be determined under federal law” and “the [state] court shall be bound by any conclusive determination of immigration status by the federal government,” with a “conclusive determination” defined as one which, under federal law, “would be given preclusive effect on the question.” Id. at §§ 1(E)(4); 3(E)(4).
The federal government alone, however, has the power to classify non-citizens. Arizona, 132 S.Ct. at 2506; DeCanas, 424 U.S. at 354, 96 S.Ct. 933; 8 U.S.C. § 1229a(a)(3). Although, as with its criminal enforcement provisions, the Ordinance indicates that the question of a non-citizen’s lawful or unlawful presence shall be “determined under federal law,” it nonetheless leaves the determination in the hands of state courts. Ordinance 2952 at §§ 1(E)(4); 3(E)(4). The Ordinance provides that a federal determination of a non-citizen’s status binds the court only if it is “conclusive” — in other words, according to the Ordinance, only if, under federal law, it “would be given preclusive effect on the question” of whether an occupant is lawfully present under federal law. Id. But a non-citizen’s immigration status, even in federal proceedings, may not conclusively determine lawful or unlawful presence.
Whereas the Supreme Court has made clear that there are “significant complexities involved in [making] ... the determination whether a person is removable,” and the decision is “entrusted to the discretion of the Federal Government,” Arizona, 132 S.Ct. at 2506; see also Plyler, 457 U.S. at 236, 102 S.Ct. 2382 (Blackmun, J., concurring) (“[T]he structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported”), the Ordinance allows state courts to assess the legality of a non-citizen’s presence absent a “preclusive” federal determination, opening the door to conflicting state and federal rulings on the question.
The judicial review provision in this case is distinguishable from that upheld by the Supreme Court in Whiting, even though they both give the federal determination a rebuttable presumption of accuracy. Whiting, 131 S.Ct. at 1981 n. 7; Ordinance 2952 at §§ 1(E)(5); 3(E)(5). Crucially, as the Supreme Court emphasized, the law in Whiting specified that “a state court may consider ‘only’ the federal determination,” meaning that the state could not “establish unlawful status apart from the federal determination.” Whiting, 131 S.Ct. at 1981 n. 7. The rebuttable presumption given to the federal determination in Whiting, as the Court noted, operated only to give “an employer a chance to show that it did not break the state law,” a narrow mechanism with no counterpart in Farmers Branch’s Ordinance. 131 S.Ct. at 1981 n. 7. Here, the Ordinance does not similarly confine the state court to the federal determination, providing only that the state court *537 must be bound by federal determinations having “preclusive effect.” Ordinance 2952 at §§ 1(E)(4); 3(E)(4). Furthermore, the relevant determination in Whiting turned on a singular federal statutory definition: whether the alien has “the legal right or authorization under federal law to work in the United States as described in 8 U.S.C. § 1324a(h)(3),” Ariz.Rev.Stat. Ann. § 23-211 (2008). In turn, the statute defines such an alien as “lawfully admitted for permanent residence” or having received work authorization from the federal government. 8 U.S.C. § 1324a(h)(3). Those determinations do not involve the discretion and variability inherent in a determination of whether an alien is “lawfully present in the United States.” See Ordinance 2952 at §§ 1(E)(4); 3(E)(4).
For these reasons, we hold that because the power to classify non-citizens is reserved exclusively to the federal government, the judicial review section of the Ordinance also is preempted by federal law. See 8 U.S.C. § 1229a(a)(3) (setting out the “sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States”).[17]
V. Severability
Because the Ordinance lacks functional coherence without its criminal offense and penalty provisions, as well as without its overarching judicial review process, we decline to apply the general severability clause to revise and leave intact any remaining parts of the Ordinance. See Rose v. Doctors Hosp., 801 S.W.2d 841, 844 (Tex.1990); see generally Champlin Ref. Co. v. Corp. Comm’n, 286 U.S. 210, 234-35, 52 S.Ct. 559, 76 L.Ed. 1062 (1932); Arizona, 132 S.Ct. at 2505 (invalidating Arizona law seeking to achieve federal deterrence goal because of “a conflict in the method of enforcement”). This restraint is necessary because these elements, along with other interdependent requirements, notably that the Ordinance “shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens,” Ordinance 2952 at §§ 1(F); 3(F), as well as its explicit, prospective-only effective date tied to the instant federal constitutional litigation, id. at § 7, create provisions that “are connected in subject-matter, dependent on each other, operating together for the same purpose.” See Rose, 801 S.W.2d at 844; see also Nat’l Fed. of the Blind of Tex., Inc. v. Abbott, 647 F.3d 202, 210 (5th Cir.2011) (explaining that the severability of unconstitutional provisions of a state enactment is a question of state law).
The dissenting opinion describes the Ordinance as merely a “licensing-based regulatory program” and asserts that its “primary purpose is to effectuate licensing of apartment and single family rentals under the supervision of the building inspector.” The idea that the Ordinance is primarily designed to promote a civil licensing scheme is contradicted not only by the Ordinance’s criminal enforcement apparatus, see supra, but by the Ordinance’s explicit reference to federal criminal anti-harboring law, Ordinance 2952, pmbl., by Farmers Branch’s consistent emphasis on the Ordinance’s “concurrent enforcement” *538 of “federal criminal immigration law,”[18] and by City officials’ blunt and exclusionary statements in the record. The City unhesitatingly has admitted, contrary to the dissenting opinion’s characterization, that the Ordinance’s purpose “is to prevent aliens not lawfully present in the United States from renting housing in the City of Farmers Branch” and to “discourag[e] such aliens from unlawfully remaining in the United States.” As one City Council member testified, its “aim ... was to try to make it more difficult for individuals who are in this country illegally to reside in Farmers Branch.”
Furthermore, removing the Ordinance’s criminal offense, judicial review, and penalty provisions[19] would leave only three substantive sections: licensing, immigration status verification, and enforcement. Unlike driver’s licenses, which, as the dissenting opinion notes, promote “road safety and vehicle insurance,” rental licenses — as the Ordinance’s supporters themselves admit — do not confer any independent benefit. (As city council member Tim Scott testified, “I don’t think that there’s a necessitated benefit from having a license ... it’s kind of benefit neutral.”). Instead, their purpose in the Ordinance’s scheme is limited to the consequences of their revocation based on a finding of unlawful presence. A verification of immigration status, however, as discussed above, does not necessarily determine lawful presence. And even assuming Farmers Branch could obtain such a determination, it would serve no purpose without the Ordinance’s criminal and civil enforcement provisions. See Rose, 801 S.W.2d at 844 (severing unconstitutional portions of an Ordinance only where the remainder is “capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected.”). That leaves the Ordinance’s civil enforcement provision. The dissenting opinion asserts that Farmers Branch “hopes” that civil enforcement will prompt landlords and renters to “generally” comply with its provisions, and non-citizens to “make other housing choices.” But the Ordinance’s only civil enforcement mechanism — suspension of a landlord’s license — is both premised on the landlord having committed an offense under §§ 1(C)(7) or 3(C)(7), see Ordinance 2952 at §§ 1(D)(5), (7); 3(D)(5), (7), and appealable only through the judicial review process that we hold to be preempted, see id. at §§ 1(E)(1); 3(E)(1).[20] Thus, we conclude that the Ordinance’s provisions are so “essentially and inseparably connected in substance” that, despite the presence of a severability clause, they are not severa *539 ble under Texas law. See Rose, 801 S.W.2d at 844.
VI. Conclusion
Because the Ordinance’s criminal offense and penalty provisions and its state judicial review process conflict with federal law, we AFFIRM the judgment of the district court.

. Proclamation No. 6398, 56 Fed.Reg. 66,951 (Dec. 23, 1991) (Presidential speech commemorating the hundredth anniversary of Ellis Island).

. See J. Shklar, American Citizenship: The Quest for Inclusion, 5 (1991).

. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision,” id. at 2500-01, but here, the plaintiffs do not argue that the Ordinance is expressly preempted by any provision of federal law.

. The dissenting opinion’s assertion that the Supreme Court rejected this analysis in DeCanas, confuses the field and conflict preemption inquiries. The Court in DeCanas noted that § 1324’s then-exemption of employment from the definition of "harboring” was insufficient to conclude that Congress intended to occupy the field of non-citizen employment and therefore "to pre-empt all state regulation” in that area. 424 U.S. at 360 & n. 9, 96 S.Ct. 933. While providing shelter can, by contrast, constitute harboring under § 1324, see United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir.1977), we conclude that the Ordinance is conflict preempted, without reaching field preemption. The Court in De-Canas explicitly based its decision on field preemption grounds and remanded the question of conflict preemption. See id. at 360 n. 9, 96 S.Ct. 933 (noting that § 1324 and other "cited statutory provisions” would be "relevant on remand in the analysis of actual or potential conflicts between [the California provision] and federal law.”).

. We have held that harboring requires making a non-citizen’s illegal presence in the United States “substantially easier or less dif *530 ficult." United States v. Shum, 496 F.3d 390, 392 (5th Cir.2007); see, e.g., United States v. Hinojos-Mendez, 270 Fed.Appx. 368, 369 (5th Cir.2008) (acting as a lookout at an apartment complex); Shum, 496 F.3d at 390 (providing false identifications and failing to file social security paperwork for employees); United States v. Ramirez, 250 Fed.Appx. 80, 83 (5th Cir.2007) (barring officers from bedroom where illegal non-citizens were hiding, providing non-citizens with necessities including food and shelter, and attempting to prevent their being discovered by probation officers); Varkonyi, 645 F.2d at 453 (instructing immigrant employees to avoid detection, interfering with federal agents, and helping one non-citizen escape from custody); Cantu, 557 F.2d at 1180 (instructing employees to act like customers so they could evade arrest).

.Of course, not every case will end in removal. Discretion is built into our immigration system. Arizona, 132 S.Ct. at 2499 ("Discretion in the enforcement of immigration law embraces immediate human concerns.... Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission.”).

. Cf. Whiting, 131 S.Ct. at 1986 ("Congress's objective in authorizing the development of E-Verify was to ensure reliability in employment authorization verification, combat counterfeiting of identity documents, and protect employee privacy. Arizona’s requirement that employers operating within its borders use E-Verify in no way obstructs achieving those aims.”).

. See Arizona, 132 S.Ct. at 2505 (A "[cjonflict in technique can be fully as disruptive to the system Congress enacted as a conflict in overt policy.”) (internal quotation marks and citation omitted).

. Other courts also have found state anti-harboring provisions to be preempted by federal law. See Ga. Latino Alliance for Human Rights v. Georgia, 691 F.3d 1250, 1267 (11th Cir.) (holding that § 1324 preempted Georgia law criminalizing harboring of aliens), reh’g en banc denied, No. 11-13044 (11th Cir. Nov. 27, 2012); United States v. Alabama, 691 F.3d 1269 (11th Cir.2012), cert. denied 569 U.S. -, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013) (No. 12-884) (holding that § 1324 preempted Alabama law criminalizing concealing or harboring an unlawfully present alien and entering into a rental agreement with an unlawfully present alien); Lozano v. City of Hazleton, 620 F.3d 170, 223 (3d Cir.) (holding that § 1324 preempted a local ordinance prohibiting renting housing to illegal aliens), cert. granted and vacated on other grounds,-U.S. -, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011); United States v. South Carolina, 906 F.Supp.2d 463, 467-68 (D.S.C.2012) (holding that § 1324 preempted South Carolina law creating state crimes for harboring, both relating to harborers and aliens themselves); Valle del Sol v. Whiting, No. 10-1061, 2012 WL 8021265 (D.Ariz. Sept. 5, 2012) (enjoining Arizona law creating state crimes for, inter alia, transporting and harboring aliens as preempted by § 1324). The Eleventh Circuit held, as we do here, that failing to limit harboring to activity facilitating evasion from federal authorities was an "untenable expansion of the federal harboring provision.” Alabama, 691 F.3d at 1288. But see Keller v. City of Fremont, No. 12-1702, 719 F.3d 931, 2013 WL 3242111 (8th Cir. June 28, 2013) (holding that a local ordinance prohibiting rental housing for illegal aliens was not field preempted and did not conflict with the federal removal process, and where the ordinance specified it did not prohibit conduct "expressly permitted by federal law,” did not conflict with federal anti-harboring law).

. As previously noted, an occupancy license may be revoked only after the building inspector ascertains, after twice making inquiry to the federal government, that "the occupant is an alien who is not lawfully present in the United States.” Ordinance 2952 at §§ 1(D)(2),(4); 3(D)(2),(4). The dissenting opinion asserts that after applying for and receiving an occupancy license, a renter is protected from criminal liability even if the license is revoked. The Ordinance makes it a criminal offense for a renter to "be an occupant of a [single family residence or apartment] without first obtaining a valid occupancy license permitting the person to occupy that” residence. Ordinance 2952 at §§ 1(C)(1); 3(C)(1). The offense refers to an ongoing condition; "be[ing] an occupant” without first obtaining a valid license "permitting” — in the present tense — such occupancy. Id. A license is not valid after it is revoked, nor can it "permit[ ]” ongoing occupancy. Even assuming, arguendo, that a license granted after the preliminaiy application is valid until revocation, the dissenting opinion's strained interpretation would require rewriting the offense’s language to criminalize only moving into an apartment without first obtaining a valid license.

. Notably, also, the implementing regulations for Congress's E-Verify employment verification system allow employees to contest a finding, and forbid employers from taking adverse action against the employee while a final resolution is pending. Pilot Programs for Employment Eligibility Confirmation, 62 Fed.Reg. 48,309, 48,312-13 (Sept. 15, 1997).

. Cf. 8 U.S.C. § 1621(c)(1)(B) (limiting access to "public or assisted housing” for non-citizens who do not meet certain criteria).

. The dissenting opinion perceives an inconsistency with the harboring statute where none exists. Section 1324 obligates the federal government to prove that a non-citizen has "come to, entered, or remains in the United States in violation of law.” 8 U.S.C. § 1324(a)(l)(A)(iii). Proving this violation beyond a reasonable doubt may require proof beyond a non-citizen’s immigration status, such as records of an adjudicative proceeding or the testimony of an immigration officer. 8 U.S.C. § 1324(a)(l)(A)(iii). Contrary to the dissenting opinion’s assertion, Farmers Branch cannot erect a concurrent criminal and state judicial enforcement regime based on an inquiry to administrative entities that provide only a renter’s immigration status, not a conclusive determination of lawful or unlawful presence.

.See also Responsibility of Certain Entities to Notify the Immigration and Naturalization Service of Any Alien Who the Entity "Knows” Is Not Lawfully Present in the United States, 65 Fed.Reg. 58,301, 58, 302 (Sept. 28, 2000) ("A [SAVE] response showing no Service record on an individual or an immigration status making the individual ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present.”). Similarly, the government states in its brief as amicus curiae that SAVE does not provide an independent, binary determination of an individual's "lawful presence.”

. The dissenting opinion states that prosecution of both renters and landlords under the Ordinance would rest on violation of licensing provisions, rather than the immigration status of the renter. This is a distinction without a difference. See Odebrecht, 715 F.3d at 1283-85 (finding the state’s “purported distinction’’ between punishing a false statement rather than the "conduct itself” to be "unpersuasive.”). The Ordinance criminalizes ”be[ing] an occupant of a leased or rented single family residence [or apartment] without first obtaining a valid occupancy license permitting the person to occupy that single family residence [or apartment],” and "knowingly permitting] an occupant to occupy an apartment [or single family residence] without a valid residential occupancy license,” Ordinance 2952 at §§ 1(C)(1), 1(C)(7); 3(C)(1), 3(C)(7). An occupancy license is revoked based on a finding of the occupant’s unlawful presence. Id. at §§ 1(D)(4); 3(D)(4). This link is made doubly apparent by the fact that the Ordinance allows landlords and occupants to challenge a license revocation or a license deficiency notice by seeking judicial review of "the question of whether the occupant is lawfully present in the United States.” Id. at §§ 1(E)(1), (3); 3(E)(1), (3). We note, also, that the Supreme Court has used the state arrest authority granted in § 1324(c) as a "limited circumstance[ ] in which state officers may perform the functions of an immigration officer” under federal supervision. Arizona, 132 S.Ct. at 2506. This is so because ”[t]here are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable,” that exist even where persons themselves are not prosecuted for removability per se. Id.

. As the Court noted in Arizona, allowing state officers to make warrantless arrests would give those officers "even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers.” 132 S.Ct. at 2506 (citing 8 U.S.C. § 1226(a), (c)(1)).

. Because our conclusion is based on a finding of conflict preemption, we need not reach the question of field preemption. Cf. Odebrecht Constr., Inc. v. Sec’y, Fla. Dep’t of Transp., 715 F.3d 1268, 1287 n. 7 (11th Cir.2013) ("Because our conclusion that the state Act conflicts with federal law is sufficient to affirm the judgment below, we decline to speak to field preemption as a separate issue, or to.... address[ ] the foreign affairs power or the dormant Foreign Commerce Clause.”) (quoting Crosby, 530 U.S. at 379, 120 S.Ct. 2288).

. Farmers Branch's insistence that the Ordinance concurrently enforces federal criminal law — describing it before the district court as “clearly proscrib[ing] the same conduct [as § 1324], knowingly harboring an unauthorized alien in apartment building”; "a different mechanism against the same proscribed conduct; [as the] federal crime”; and "reinforc[ing] the federal criminal immigration law against harboring” — goes unmentioned by the dissent.

. The penalty provision applies only after a person is convicted under one of the Ordinance's enumerated criminal offenses. Id. at § 5.

.The dissenting opinion concludes that certain portions of the Ordinance's judicial review provisions are also severable. Even excising these portions, however, the Ordinance is left with the language that in "answering the question” whether “the occupant is lawfully present in the United States ... the court shall be bound by any determination of immigration status by the federal government.” Ordinance 2952 at §§ 1(E)(4); 3(E)(4). As set out above, however, a determination of immigration status from the federal government does not necessarily answer the question of lawful presence, and the Ordinance would leave state courts without remedy if immigration status did not conclusively answer the question.